## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MISSOURI
## SOUTHEASTERN DIVISION

|  |  |  |
|---|---|---|
| | § | **Chapter 11** |
| In re: | § | |
| | § | **Case No. 20-43597-399** |
| **BRIGGS & STRATTON** | § | |
| **CORPORATION,** *et al.,* | § | **(Jointly Administered)** |
| | § | |
| Debtors. | § | Related Docket Nos 53, 505, 628, 878 |

**ORDER (I) AUTHORIZING THE SALE OF THE ASSETS AND EQUITY
INTERESTS TO THE PURCHASER FREE AND CLEAR OF LIENS,
CLAIMS, INTERESTS, AND ENCUMBRANCES; (II) AUTHORIZING
THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY
CONTRACTS AND UNEXPIRED LEASES; AND (III) GRANTING RELATED RELIEF**

Upon the motion (the "**Motion**")[1] of the above-captioned debtors and debtors in possession (collectively, the "**Debtors**") for entry of an order (this "**Sale Order**"), pursuant to sections 105, 363, and 365 of title 11 of the United States Code (the "**Bankruptcy Code**"), Rules 2002, 6004, and 6006 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rule 9013-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the Eastern District of Missouri the "**Local Rules**") (i) authorizing and approving the sale (the "**Sale Transaction**") of substantially all of the Debtors' assets (the "**Assets**") and the equity interests held in the Debtors' non-Debtor subsidiaries and certain joint ventures equity interests held by the Debtors (collectively, the "**Equity Interests**"), free and clear of all liens, claims, interests, and encumbrances, except for certain permitted encumbrances as determined by the Debtors and the purchaser of the Assets and Equity Interests, with liens, if any, to attach to the proceeds of the applicable Sale Transaction; (ii) authorizing and approving the assumption and

---

[1]     Capitalized terms used but not defined herein shall have the meanings given to them in the Motion or the Stalking Horse Agreement (as defined below), as applicable.

assignment of certain executory contracts and unexpired leases (collectively, the "**Purchased Contracts**"); and (iii) granting related relief, all as more fully set forth in the Motion; and upon consideration of (a) the Snellenbarger Declaration; (b) the Ficks Declaration; (c) the *Declaration of Jeffrey Ficks in Support of Motion of Debtors (1) for Entry of an Order (I) Approving (A) Bidding Procedures, (B) Designation of Stalking Horse Bidder and Stalking Horse Bid Protections, (C) Scheduling Auction and Sale Hearing, (D) Form and Manner of Notice of Sale Auction, and Hearing, and (E) Assumption and Assignment Procedures and (II) Granting Related Relief and (2) for Interim and Final Orders (I) Authorizing Debtors to Obtain Postpetition Financing, (II) Authorizing Debtors to Use Cash Collateral, (III) Granting Liens and Superpriority Claims, (IV) Granting Adequate Protection to Prepetition Secured Parties, (V) Modifying Automatic Stay, (VI) Scheduling Final Hearing and (VII) Granting Related Relief* [Docket No. 460] (the "**Second Ficks Declaration**"); (d) the *Supplemental Declaration of William G. Peluchiwski in Support of Motion of Debtors for Entry of an Order (I) Approving (A) Bidding Procedures, (B) Designation of Stalking Horse Bidder and Stalking Horse Bid Protections, (C) Scheduling Auction and Sale Hearing, (D) Form and Manner of Notice of Sale Auction, and Hearing, and (E) Assumption and Assignment Procedures and (II) Granting Related Relief* [Docket No. 459] (the "**Peluchiwski Bidding Declaration**"); and (e) the *Second Supplemental Declaration of William G. Peluchiwski in Support of Motion of Debtors for Entry of an Order Authorizing (A) Sale of Debtors' Assets and Equity Interests Free and Clear of Liens, Claims, Interests, and Encumbrances and (B) Assumption and Assignment of Executory Contracts and Unexpired Leases; and Granting Related Relief* [Docket No. 876] (the "**Supplemental Peluchiwski Declaration**") (collectively, the "**Declarations**"); and this Court having entered the *Order (I) Approving (A) Bidding Procedures, (B) Designation of Stalking Horse Bidder and*

*Stalking Horse Bid Protections, (C) Scheduling Auction and Sale Hearing, (D) Form and Manner of Notice of Sale, Auction, and Sale Hearing, and (E) Assumption and Assignment Procedures and Form and Manner of Notice of Assumption and Assignment and (II) Granting Related Relief* [Docket No. 505] (the "**Bidding Procedures Order**"), authorizing and approving, among other things, (i) the competitive bidding procedures by which the Debtors were to solicit and select the highest or otherwise best offer for the sale of the Assets and Equity Interests (the "**Bidding Procedures**"); (ii) Debtors' designation of Bucephalus Buyer, LLC (the "**Purchaser**") as the stalking horse bidder and certain Bid Protections (as defined in the Motion, the "**Bid Protections**") granted to the Purchaser pursuant to that certain *Stock and Asset Purchase Agreement*, effective as of July 19, 2020, by and among the Debtors, as Sellers, and the Purchaser, as Buyer (together with the schedules and exhibits thereto, and as it may be amended, modified, or supplemented from time to time in accordance with the terms thereof, the "**Stalking Horse Agreement**"), a copy of which is attached hereto as **Exhibit A**; (iii) the procedures for the assumption and assignment of Purchased Contracts to the Purchaser; (iv) the form and manner of notice of all procedures, protections, schedules, and agreements described in the Motion, including the Sale Notice, the Assumption and Assignment Notice, and the Assumption and Assignment Procedures; and (v) the scheduling of an auction for the sale of Assets and Equity Interests, the Sale Hearing (as defined below), and certain other dates relating to the Sale Transaction, all as more fully set forth in the Motion; and the Debtors having determined that the Purchaser has submitted the highest or otherwise best bid for the Acquired Assets and Acquired Equity (each, as defined in the Stalking Horse Agreement, and, collectively, the "**Purchased Assets**") in each case subject to the Assumed Liabilities (as defined in the Stalking Horse Agreement) and determined that the Purchaser is the Successful Bidder under the sale process authorized by the Bidding Procedures Order; and the

3

Court having conducted a hearing on the Motion on August 18, 2020 (the "**Bidding Procedures Hearing**"); and the Court having conducted a further hearing on the Motion on September 15, 2020 (the "**Sale Hearing**"), at which time all interested parties were offered an opportunity to be heard with respect to the Motion; and the Court having reviewed and considered the Motion, the Declarations, the Stalking Horse Agreement, and any and all objections to the Sale Transaction and the Stalking Horse Agreement filed in accordance with the Bidding Procedures Order; and the Court having heard statements of counsel and the evidence presented in support of the relief requested in the Motion at the Sale Hearing; and it appearing that due notice of the Motion, the Stalking Horse Agreement, and the Bidding Procedures Order has been provided; and it appearing that the relief requested in the Motion is in the best interests of the Debtors, their estates, their stakeholders, and all other parties in interest; and it appearing that the legal and factual bases set forth in the Motion and at the Sale Hearing establish just cause for the relief granted herein; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and this Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), and that this Court may enter a final order consistent with Article III of the United States Constitution; and this Court having found that venue of this proceeding in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, it is **HEREBY ORDERED THAT**:

A.      This Court has jurisdiction over this matter and over the property of the Debtors' estates, including the Purchased Assets to be sold, transferred, or conveyed pursuant to the Stalking Horse Agreement, pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  The predicates for relief granted herein are sections 105, 363, and 365 of

the Bankruptcy Code, Bankruptcy Rules 2002, 6004, and 6006, and Local Rule 9013-1.  Venue in this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

      B.     The legal and factual bases set forth in the Motion and at the Sale Hearing establish just cause for the relief granted herein.  Entry of this Sale Order is in the best interests of the Debtors and their respective estates, creditors, and all other parties in interest.

      C.     The notice of the Motion, the Bidding Procedures, the Bid Deadline (as defined in the Bidding Procedures Order), the selection of the Purchaser, the Sale Hearing, the Cure Costs (as defined in the Stalking Horse Agreement), and the Sale Order was adequate and sufficient under the circumstances of these chapter 11 cases, and such notice complied with all applicable requirements of the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules.  Accordingly, no further notice of the Motion, the Bidding Procedures, the Bid Deadline the selection of the Purchaser, the Sale Hearing, the Cure Costs, or this Sale Order is necessary or required.

      D.     The Debtors filed the *Notice of Sale, Bidding, Procedures, Auction, and Sale Hearing* [Docket No. 527] (the "**Sale Notice**") on August 20, 2020 and served the Sale Notice on the proper notice parties on August 21, 2020.[2]  On August 25, 2020, the Sale Notice was published in *The Wall Street Journal, National Edition* (the "**Publication Notice**").[3]  The Debtors filed the *Notice of Cancellation of Auction and Designation of the Stalking Horse Bid as the Successful Bid* [Docket No. 679] (the "**Cancellation of Auction**") on August 31, 2020 and served the Cancellation of Auction on the proper notice parties on August 31, 2020.[4]

---

[2] *See Certificate of Service* [Docket No. 572].

[3] *See Certificate of Publication* [Docket No. 699].

[4] *See Certificate of Service* [Docket No. 689].

E.      The Debtors filed the *Notice of Cure Costs and Proposed Assumption and Assignment of Executory Contracts and Unexpired Leases in Connection with Sale* on August 19, 2020 [Docket Nos. 513-516] and August 21, 2020 [Docket No. 537] (together, the "**Initial Assumption and Assignment Notice**") and served the Initial Assumption and Assignment Notice on the non-Debtor contract counterparties to the Purchased Contracts (the "**Counterparties**") on August 21, 2020. The Debtors thereafter filed the *Amended Notice of Cure Costs and Proposed Assumption and Assignment of Executory Contracts and Unexpired Leases in Connection with Sale* Notice on September 14, 2020 [Docket No. 879] (the "**Amended Assumption and Assignment Notice**" and, collectively with the Initial Assumption and Assignment Notice and any subsequently filed notice amending the Amended Assumption and Assignment Notice pursuant to Paragraph 22 herein (any such amended notice, the "**Further Amended Assumption and Assignment Notice**"), the "**Assumption and Assignment Notice**"), which amended the Initial Assumption and Assignment Notice, and served the Amended Assumption and Assignment on the affected Counterparties, as provided in the Bidding Procedures Order.

F.      The service of the Initial Assumption and Assignment Notice and the Amended Assumption and Assignment Notice was timely, good, sufficient, and appropriate under the circumstances and no further notice need be given with respect to the Cure Costs for the assumption and assignment of the Purchased Contracts.  All non-Debtor parties to the Purchased Contracts have had a reasonable opportunity to object to the Cure Costs listed on the Assumption and Assignment Notice, to the Purchaser's adequate assurance of future performance, and to the assumption and assignment of the Purchased Contracts to Purchaser.  No defaults exist in the Debtors' performance under the Purchased Contracts as of the date of this Sale Order other than

the failure to pay the Cure Costs, as may be required, or such defaults that are not required to be cured.

G.    The Debtors have demonstrated a compelling and sound business justification for the Court to grant the relief requested in the Motion, including, without limitation, to (i) authorize the sale of the Purchased Assets to the Purchaser free and clear of all Liens (as defined in the Stalking Horse Agreement) other than Permitted Liens (as defined in the Stalking Horse Agreement) and subject to the Assumed Liabilities, (ii) authorize the assumption and assignment of the Purchased Contracts to the Purchaser, and (iii) grant related relief as set forth herein.  Such compelling and sound business justification, which was set forth in the Motion, on the record of the Bidding Procedures Hearing, and on the record of the Sale Hearing, is incorporated herein by reference and, among other things, forms the basis for the findings of fact and conclusions of law as set forth herein.

H.    The Debtors' decision to enter into the Stalking Horse Agreement with the Purchaser was a due and proper exercise of the Debtors' business judgment and was authorized pursuant to the Bidding Procedures Order.  The Bid Protections contained in the Stalking Horse Agreement (i) were necessary to preserve the value of the Debtors' estates by inducing the Purchaser to enter into the Stalking Horse Agreement and (ii) are in compliance with the Bidding Procedures and authorized by the Bidding Procedures Order.

I.    Notice and a reasonable opportunity to object or be heard regarding the requested relief has been afforded to all interested persons and entities as required by the Bidding Procedures Order, including, without limitation:  (i) all entities reasonably known to have expressed an interest in a transaction with respect to all or substantially all of the Purchased Assets within the past twelve (12) months; (ii) all entities known by the Debtors to have asserted any lien, claim, interest, or

encumbrance in or upon any of the Purchased Assets; (iii) counsel for the Official Committee of Unsecured Creditors (the "**Committee**"); (iv) counsel to JPMorgan Chase Bank, N.A., as administrative agent and collateral agent under the ABL Facility and DIP Facility; (v) counsel to Wilmington Trust N.A., as successor indenture trustee under the Senior Notes; (vi) the U.S. Trustee for the Eastern District of Missouri; (vii) all federal, state, and local regulatory or taxing authorities or recording offices which have a reasonably known interest in the relief granted herein; (viii) the Internal Revenue Service; (ix) the United States Attorney's offices for the Eastern District of Missouri and each state in which the Debtors operate; (x) the Office of the Secretary of State in each state in which the Debtors operate or are organized; (xi) the Federal Trade Commission; (xii) the United States Attorney General/Antitrust Division of Department of Justice; (xiii) the United States Environmental Protection Agency; (xiv) all known creditors and interest holders of the Debtors; (xv) all non-Debtor parties to the Debtors' executory contracts and unexpired leases; and (xvi) parties entitled to notice pursuant to Local Rule 9013-3 (collectively, the "**Notice Parties**"). Other parties interested in bidding on the Assets and Equity Interests were provided, upon request, sufficient information to make an informed judgment on whether to bid on the Assets and Equity Interests.

J.      The Debtors have demonstrated a sufficient basis for entering into the Stalking Horse Agreement, to sell the Purchased Assets, and to assume and to assign the Purchased Contracts pursuant to sections 363 and 365 of the Bankruptcy Code, and such actions are appropriate exercises of the Debtors' business judgment and in the best interests of the Debtors, their estates, their creditors, and other parties in interest.  Such business reasons include, but are not limited to, that (i) the Stalking Horse Agreement and the closing of such agreement (the "**Closing**") will present the best opportunity to maximize and realize the value of the Purchased

8

Assets, (ii) there is substantial risk of deterioration of the value of the Purchased Assets if the Sale Transaction is not consummated as promptly as reasonably practicable, (iii) the Purchaser will assume, pursuant to the Stalking Horse Agreement, the Assumed Liabilities, and (iv) the Stalking Horse Agreement constitutes the highest or otherwise best offer for the Purchased Assets.

K.    The Bidding Procedures set forth in the Bidding Procedures Order were noncollusive and substantively and procedurally fair to all parties.

L.    The disclosures made by the Debtors in the Motion, the Sale Notice, and related notices and documents filed with the Court concerning the Stalking Horse Agreement, the Bidding Procedures Order, the Sale Hearing, and the Sale Transaction were good, complete, and adequate.

M.    The Debtors and their professionals have complied, in good faith, in all respects with the Bidding Procedures Order.  As demonstrated by any testimony and other evidence proffered or adduced at the Bidding Procedures Hearing and the Sale Hearing and the representations of counsel made on the record at the Bidding Procedures Hearing and the Sale Hearing, through marketing efforts and a competitive sale process conducted in accordance with the Bidding Procedures Order, the Debtors (i) afforded interested potential purchasers a full, fair, and reasonable opportunity to qualify as bidders and submit their highest or otherwise best offer to purchase the Purchased Assets, (ii) provided potential purchasers, upon request, sufficient information to enable them to make an informed judgment on whether to bid on the Purchased Assets, and (iii) considered any bids submitted on or before the Bid Deadline.  The Purchaser and its professionals have complied, in good faith, in all respects with the Bidding Procedures Order. The Bidding Procedures assisted in obtaining the highest or otherwise best value for the Purchased Assets for the Debtors and their estates.

N.      As the Debtors received no Qualified Bids (as defined in the Bidding Procedures) by the Bid Deadline, the Debtors determined that the Purchaser submitted the highest or otherwise best offer and selected the Purchaser as the Successful Bidder for the Purchased Assets in accordance with the Bidding Procedures Order. *See Notice of Cancellation of Auction and Designation of the Stalking Horse Bid as the Successful Bid* [Docket No. 679].The offer of the Purchaser, upon the terms and conditions set forth in the Stalking Horse Agreement, including the form of and total consideration to be realized by the Debtors pursuant to the Stalking Horse Agreement, (i) is the highest or otherwise best offer received by the Debtors, (ii) is fair and reasonable, (iii) is in the best interests of the Debtors' estates, their creditors, and other parties in interest, and (iv) constitutes full and adequate consideration and reasonably equivalent value for the Purchased Assets. The Debtors' determination that the Stalking Horse Agreement constitutes the highest or otherwise best offer for the Purchased Assets constitutes a valid and sound exercise of the Debtors' business judgment. The Stalking Horse Agreement and the Sale Transaction contemplated thereby represent a fair and reasonable offer to purchase the Acquired Assets under the circumstances of these chapter 11 cases. No other entity or group of entities has offered to purchase the Acquired Assets for greater economic value to the Debtors' estates than the Purchaser.

O.      The Purchaser is not an "insider" or "affiliate" of the Debtors, as those terms are defined in the section 101 of the Bankruptcy Code. The Purchaser is a buyer in good faith, as that term is used in the Bankruptcy Code and the decisions thereunder; the Stalking Horse Agreement was negotiated and entered into in good faith, based upon arm's length bargaining, and without collusion or fraud of any kind; and neither the Debtors nor the Purchaser has engaged in any conduct that would prevent the application of section 363(m) of the Bankruptcy Code or cause the

application of or implicate section 363(n) of the Bankruptcy Code to the Stalking Horse Agreement or to the consummation of the Sale Transaction and transfer of the Purchased Assets and Purchased Contracts to the Purchaser. Accordingly, the Purchaser is entitled to all of the protections and immunities under section 363(m) of the Bankruptcy Code with respect to all of the Purchased Assets, including the Purchased Contracts.

P.      The Debtors are authorized and directed to execute the Stalking Horse Agreement and all other documents contemplated thereby, and to promptly consummate the Sale Transaction contemplated by the Stalking Horse Agreement. No consents or approvals, other than as may be expressly provided for in the Stalking Horse Agreement, are required by the Debtors to consummate such Sale Transaction.

Q.      The Debtors have advanced sound business reasons for seeking to enter into the Stalking Horse Agreement and to sell the Purchased Assets and assume and assign the Purchased Contracts, as more fully set forth in the Motion and the Declarations, and as demonstrated at the Sale Hearing, and it is a reasonable exercise of the Debtors' business judgment to sell the Purchased Assets and to consummate the Sale Transaction contemplated by the Stalking Horse Agreement. Notwithstanding any requirement for approval or consent by any person, the transfer of the Purchased Assets to the Purchaser and the assumption and assignment of the Purchased Contracts is a legal, valid, and effective transfer of the Purchased Assets, including the Purchased Contracts.

R.      The terms and conditions of the Stalking Horse Agreement, including the consideration to be realized by the Debtors pursuant to the Stalking Horse Agreement, are fair and reasonable, and the Sale Transaction contemplated by the Stalking Horse Agreement are in the best interests of the Debtors' estates.

11

S.      Except as otherwise provided in the Stalking Horse Agreement, the Purchased

Assets shall be sold subject to the Assumed Liabilities and free and clear of any lien (statutory or

otherwise), hypothecation, encumbrance, security interest, mortgage, pledge, restriction, charge,

instrument, license, preference, priority, security agreement, easement, covenant, encroachment,

option, collective bargaining agreement, judgment, demand, charge of any kind or nature, or other

interest in the subject property, including, without limitation, any right of recovery, tax (including

foreign, federal, state, and local tax), order or decree of any court or foreign or domestic

Governmental Authority, or other claim with respect thereto, of any kind or nature (including

(i) any conditional sale or other title retention agreement and any lease having substantially the

same effect as any of the foregoing, (ii) any assignment or deposit arrangement in the nature of a

security device, (iii) any pension liabilities, retiree medical benefit liabilities, liabilities related to

the Employee Retirement Income Security Act of 1974 (“**ERISA**”), liabilities related to the

Internal Revenue Code, or any other liability relating to Debtors' current and former employees,

including any withdrawal liabilities (under any multiemployer pension plans or otherwise) or

liabilities under any collective bargaining agreement or labor practice agreement, retiree healthcare

or, life insurance claims, (iv) any claims based on any theory that the Purchaser is a successor,

transferee or continuation of the Debtors or the Purchased Assets, whether in law or equity, under

any law, statute, rule, or regulation of the United States, any state, territory, or possession thereof

or the District of Columbia, and (v) any leasehold interest, license or other right, in favor of a

person other than the Purchaser, to use any portion of the Purchased Assets), whether secured or

unsecured, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed,

recorded or unrecorded, contingent or noncontingent, material or nonmaterial, known or unknown

(other than the Permitted Liens), with such Liens (other than the Permitted Liens) to attach to the

12

consideration to be received by the Debtors in the same priority and subject to the same defenses and avoidability, if any, as before the Closing.

       T.      The Stalking Horse Agreement is a valid and binding contract among the Debtors and the Purchaser, which is and shall be enforceable according to its terms.

       U.      The transfer of the Purchased Assets to the Purchaser is a legal, valid, and effective transfer of all the Purchased Assets, and, except as may otherwise be provided in the Stalking Horse Agreement, shall vest the Purchaser with all right, title, and interest of the Debtors in and to the Purchased Assets free and clear of any and all Liens (other than the Permitted Liens) and subject to the Assumed Liabilities. Except as specifically provided in the Stalking Horse Agreement or this Sale Order, the Purchaser shall not assume or be liable for any Liens (other than the Permitted Liens) relating to the Purchased Assets.

       V.      The Debtors may sell the Purchased Assets free and clear of all Liens of any kind or nature whatsoever (other than the Permitted Liens) because, in each case, one or more of the standards set forth in section 363(f) of the Bankruptcy Code has been satisfied. Those holders of Liens from which the Purchased Assets are to be sold free and clear (including, to the extent applicable, the non-Debtor parties to Purchased Contracts) who did not object, or who withdrew their objections, to the sale of the Purchased Assets and the Motion are deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy Code. All objections to the Motion have been resolved or overruled.

       W.     Not selling the Purchased Assets free and clear of all Liens (other than the Permitted Liens) would adversely impact the Debtors' estates, and any Sale Transaction of the Purchased Assets other than one free and clear of all Liens (other than the Permitted Liens) would be of substantially less value to the Debtors' estates. The Purchaser would not have entered into the

13

Stalking Horse Agreement and would not consummate the Sale Transaction contemplated thereby, thus adversely affecting the Debtors, their estates, and their creditors, if each of the sale of the Purchased Assets and the assumption and assignment of the Purchased Contracts to the Purchaser were not free and clear of all Liens of any kind of nature whatsoever (except for Permitted Liens) or if the Purchaser would, or in the future could, be liable for any Liens or any of the Excluded Liabilities (as defined in the Stalking Horse Agreement).

X.      The Debtors and the Purchaser have, to the extent necessary, satisfied the requirements of section 365 of the Bankruptcy Code, including sections 365(b)(1)(A), (B), and 365(f) of the Bankruptcy Code, in connection with the Sale Transaction and the assumption and assignment of the Purchased Contracts.  The Debtors have demonstrated that the Purchaser has provided adequate assurance of future performance with respect to all Purchased Contracts pursuant to section 365(b)(1)(C) of the Bankruptcy Code.  The assumption and assignment of the Purchased Contracts pursuant to the terms of this Sale Order is integral to the Stalking Horse Agreement and is in the best interests of the Debtors, their estates, their creditors, and other parties in interest, and represents the exercise of sound and prudent business judgment by the Debtors.

Y.      The Purchased Contracts are assignable notwithstanding any provisions contained therein to the contrary, or providing for the termination thereof upon assignment or the insolvency or commencement of the Debtors' chapter 11 cases.  The Debtors and the Purchaser, on behalf of the Debtors, have provided for appropriate cures or other payments or actions required for the Debtors to assume and assign the Purchased Contracts to the Purchaser.  The Debtors have demonstrated that the Purchaser has provided adequate assurance of future performance under all Purchased Contracts.

14

Z.      In the absence of a stay pending appeal, the Purchaser is acting in good faith, pursuant to section 363(m) of the Bankruptcy Code, in closing the Sale Transaction contemplated by the Stalking Horse Agreement at any time on or after the entry of this Sale Order and cause has been shown as to why this Sale Order should not be subject to the stay provided by Bankruptcy Rules 6004(h) and 6006(d).

AA.     The Sale Transaction contemplated pursuant to the Stalking Horse Agreement does not amount to a consolidation, merger or *de facto* merger of the Purchaser and the Debtors or the Debtors' estates, there is not substantial continuity between the Purchaser and the Debtors, there is no common identity between the Debtors and the Purchaser, there is no continuity of enterprise between the Debtors and the Purchaser, the Purchaser is not a mere continuation of the Debtors or their estates, and the Purchaser does not constitute a successor to the Debtors or their estates.

BB.     The sale of the Purchased Assets outside of a chapter 11 plan pursuant to the Stalking Horse Agreement neither impermissibly restructures the rights of the Debtors' creditors nor impermissibly dictates the terms of a liquidating plan of reorganization for the Debtors.  The sale does not constitute a *sub rosa* chapter 11 plan.

CC.     The Stalking Horse Agreement was not entered into, and none of the Debtors or the Purchaser have entered into the Stalking Horse Agreement or proposed to consummate the Sale Transaction contemplated thereby, for the purpose of hindering, delaying, or defrauding the Debtors' present or future creditors.  The total consideration provided by the Purchaser for the Purchased Assets is the highest or otherwise best offer received by the Debtors, and the Purchase Price constitutes (i) reasonably equivalent value under the Bankruptcy Code and the Uniform Fraudulent Transfer Act, (ii) fair consideration under the Uniform Fraudulent Conveyance Act and (iii) reasonably equivalent value, fair consideration and fair value under any other applicable laws

15

of the United States, any state, territory or possession, or the District of Columbia, for the Purchased Assets.

DD.    Time is of the essence in consummating the Sale Transaction.  To maximize the value of the Purchased Assets, preserve the viability of the business as a going concern, and maximize recoveries to creditors, it is essential that the sale of the Purchased Assets occur as soon as reasonably practicable.  Accordingly, there is cause to determine inapplicable the stays contemplated by Bankruptcy Rules 6004 and 6006.

EE.    The Purchaser has not agreed to assume and shall have no obligation with respect to any liabilities of the Debtors or their subsidiaries or affiliates other than as expressly set forth in the Stalking Horse Agreement.  Other than the Assumed Liabilities, and except as expressly provided for by the terms of the Stalking Horse Agreement, the Purchaser shall have no obligations with respect to any Excluded Liabilities and shall acquire all the Purchased Assets free and clear of the Excluded Liabilities.

FF.    The global settlement among the Debtors, the Committee, the Pension Benefit Guaranty Corporation, the DIP Agent and DIP Lenders, and the Purchaser described in paragraph 37 below is the result of good faith negotiations among such parties and is in the best interests of the Debtors' estates.

GG.    The Debtors, in connection with offering products or services, did not disclose any policy prohibiting the transfer of personally identifiable information and, therefore, the sale of the Purchased Assets may be approved pursuant to section 363(b)(1)(A) of the Bankruptcy Code without the appointment of a consumer privacy ombudsman, as defined in section 332 of the Bankruptcy Code.

16

HH.     Other than claims arising under the Stalking Horse Agreement, the Debtors agree and acknowledge that they have no claims against the Purchaser, and the Purchaser agrees and acknowledges that the Purchaser has no claims against the Debtors or their non-Debtor affiliates.

II.     The consummation of the Sale Transaction contemplated by the Stalking Horse Agreement is legal, valid, and properly authorized under all applicable provisions of the Bankruptcy Code, including, without limitation, sections 105(a), 363(b), 363(f), 363(m), 365(b), and 365(f), and all of the applicable requirements of such sections have been complied with in respect of the Sale Transaction.

JJ.     The findings of fact and conclusions of law herein constitute the Court's findings of fact and conclusions of law for the purposes of Bankruptcy Rule 7052, made applicable pursuant to Bankruptcy Rule 9014.  To the extent any findings of fact are conclusions of law, they are adopted as such.  To the extent any conclusions of law are findings of fact, they are adopted as such.  The Court's findings shall also include any oral findings of fact and conclusions of law made by the Court during or at the conclusion of the Sale Hearing.

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:**

1.     The Motion is granted as set forth herein.

2.     All objections, responses, reservations of rights, and requests for continuance concerning the Motion are resolved in accordance with the terms of this Sale Order and as set forth in the record of the Sale Hearing.  To the extent any such objection, response, reservation of rights, or request for continuance was not otherwise withdrawn, waived, or settled, it, and all reservations of rights contained therein, is overruled and denied on the merits with prejudice.

17

### A.    Approval of the Sale

3.    The sale of the Purchased Assets, the terms and conditions of the Stalking Horse Agreement (including all schedules and exhibits affixed thereto and all other ancillary documents), the Successful Bid by the Purchaser, and the Sale Transaction contemplated thereby and all of the terms and conditions thereof, are the highest and best offer for the Purchased Assets, and hereby are authorized and approved in all respects.

4.    The sale of the Purchased Assets and the consideration provided by the Purchaser under the Stalking Horse Agreement are fair and reasonable and shall be deemed for all purposes to constitute a transfer for reasonably equivalent value and fair consideration under the Bankruptcy Code and any other applicable law.

5.    The Purchaser is hereby granted and is entitled to all of the protections provided to a good faith buyer under section 363(m) of the Bankruptcy Code, including with respect to the transfer of Purchased Contracts as part of the sale of the Purchased Assets pursuant to section 365 of the Bankruptcy Code and this Sale Order.

6.    Pursuant to section 363(m) of the Bankruptcy Code, if any or all of the provisions of this Sale Order are hereafter reversed, modified, or vacated by a subsequent order of this Court or any other court, such reversal, modification, or vacatur shall not affect the validity and enforceability of any transfer under the Stalking Horse Agreement or obligation or right granted pursuant to the terms of this Sale Order (unless stayed pending appeal), and notwithstanding any reversal, modification, or vacatur shall be governed in all respects by the original provisions of this Sale Order and the Stalking Horse Agreement, as the case may be.

7.    Subject to the terms and conditions of the Stalking Horse Agreement, the Debtors are hereby authorized to fully perform under, consummate and implement the terms of the Stalking

Horse Agreement, together with any and all additional instruments and documents that may be reasonably necessary or desirable to implement and effectuate the terms of the Stalking Horse Agreement, this Sale Order, and sale of the Purchased Assets contemplated thereby including, without limitation, deeds, assignments, stock powers and other instruments of transfer, and to take all further actions as may be reasonably necessary for the purpose of assigning, transferring, granting, conveying, and conferring to the Purchaser, or reducing to possession any or all of the Purchased Assets or Assumed Liabilities, as may be necessary or appropriate to the performance of the Debtors' obligations as contemplated by the Stalking Horse Agreement, forthwith (including any and all pre-closing covenants and conditions) and without any further corporate action or orders of this Court. Neither the Purchaser nor the Debtors shall have any obligation to proceed with the Closing of the Stalking Horse Agreement unless and until all conditions precedent to the Purchaser's and the Debtors' respective obligations thereunder have been met, satisfied, or waived by the Purchaser and/or the Debtors, as the case may be, in each case subject to the terms of the Stalking Horse Agreement.

8.    The Debtors and each other person or entity having duties or responsibilities under the Stalking Horse Agreement, any agreements related thereto or this Sale Order, and their respective directors, officers, employees, members, agents, representatives, and attorneys, are authorized and empowered, subject to the terms and conditions contained in the Stalking Horse Agreement, to carry out all of the provisions of the Stalking Horse Agreement and any related agreements; to issue, execute, deliver, file, and record, as appropriate, the documents evidencing and consummating the Stalking Horse Agreement, and any related agreements; to take any and all actions contemplated by the Stalking Horse Agreement, any related agreements or this Sale Order; and to issue, execute, deliver, file, and record, as appropriate, such other contracts, instruments,

releases, indentures, mortgages, deeds, bills of sale, assignments, leases, or other agreements or documents and to perform such other acts and execute and deliver such other documents, as are consistent with, and necessary or appropriate to implement, effectuate, and consummate, the Stalking Horse Agreement, any related agreements, and this Sale Order and the Sale Transaction contemplated thereby and hereby, forthwith and all without further application to, or order of, this Court.

9.      The secretary, any assistant secretary, agent, representative or officer of the Debtors shall be, and hereby is, authorized to certify or attest to any of the foregoing actions (but no such certification or attestation shall be required to make any such action valid, binding, and enforceable).  The Debtors are further authorized and empowered to cause to be filed with the secretary of state of any state or other applicable officials of any applicable governmental units any and all certificates, agreements, or amendments necessary or appropriate to effectuate the Sale Transaction contemplated by the Stalking Horse Agreement, any related agreements, and this Sale Order, including amended and restated certificates or articles of incorporation and bylaws or certificates or articles of amendment, and all such other actions, filings or recordings as may be required under appropriate provisions of the applicable laws of all applicable governmental units or as any of the officers of the Debtors may determine are necessary or appropriate.  The execution of any such document or the taking of any such action shall be, and hereby is, deemed conclusive evidence of the authority of such person to so act.  Without limiting the generality of the foregoing, this Sale Order shall constitute all approvals and consents, if any, required by the corporation laws of the states in which the Debtors are organized and all other applicable business corporation, trust and other laws of the applicable governmental units, with respect to the implementation and

consummation of the Stalking Horse Agreement, any related agreements and this Sale Order, and the Sale Transaction contemplated thereby and hereby.

10.    Upon consummation of the Sale Transaction set forth in the Stalking Horse Agreement, if any person or entity that has filed financing statements, mortgages, mechanic's liens, *lis pendens*, or other documents or agreements evidencing encumbrances, claims, interests, and Liens against or in the Purchased Assets shall not have delivered to the Debtors prior to the Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfactions, releases of all encumbrances, claims, interests, and Liens that the person or entity has with respect to the Purchased Assets (unless otherwise assumed in the Stalking Horse Agreement), or otherwise, then (a) the Debtors are hereby authorized to execute and file such statements, instruments, releases, and other documents on behalf of the person or entity with respect to the Purchased Assets and (b) the Purchaser is hereby authorized to file, register, or otherwise record a certified copy of this Sale Order, which, once filed, registered, or otherwise recorded, shall constitute conclusive evidence of the release of all encumbrances, claims, interests, and Liens in the Purchased Assets of any kind or nature.  For the avoidance of doubt, to the extent necessary, upon consummation of the Sale Transaction set forth in the Stalking Horse Agreement, the Purchaser is authorized to file termination statements, lien terminations, or other amendments in any required jurisdiction to remove and record, notice filings or financing statements recorded to attach, perfect or otherwise notice any lien or encumbrance that is extinguished or otherwise released pursuant to this Sale Order under section 363 and related provisions of the Bankruptcy Code.  For the avoidance of doubt, nothing contained in this paragraph 10 shall be deemed to apply with respect to any Permitted Liens.

11.     Effective as of the Closing, (a) the sale of the Purchased Assets by the Debtors to the Purchaser shall constitute a legal, valid, and effective transfer of the Purchased Assets notwithstanding any requirement for approval or consent by any person and vests the Purchaser with all right, title and interest of the Debtors in and to the Purchased Assets, free and clear of all Liens of any kind (other than the Permitted Liens), pursuant to section 363(f) of the Bankruptcy Code, and (b) the assumption of any Assumed Liabilities by the Purchaser constitutes a legal, valid, and effective delegation of any Assumed Liabilities to the Purchaser and divests the Debtors of all liability with respect to any Assumed Liabilities.

12.     Neither the Debtors nor the Purchaser has engaged in any conduct that would cause or permit the Stalking Horse Agreement to be avoided or costs and damages to be imposed under section 363(n) of the Bankruptcy Code. Accordingly, the Stalking Horse Agreement and the Sale Transaction shall not be avoidable under section 363(n) of the Bankruptcy Code, and no party shall be entitled to any damages or other recovery pursuant to section 363(n) of the Bankruptcy Code in respect of the Purchase Agreement or the Sale Transaction.

**B.      Transfer of Purchased Assets**

13.     Except to the extent specifically provided in the Stalking Horse Agreement and subject to the terms and conditions thereof, upon the Closing, the Debtors shall be, and hereby are, authorized, empowered, and directed, pursuant to sections 105, 363(b), and 365 of the Bankruptcy Code, to sell the Purchased Assets, including the Purchased Contracts, to the Purchaser.  The sale of the Purchased Assets vests the Purchaser with all right, title and interest of the Debtors in and to the Purchased Assets free and clear of any and all Liens (other than the Permitted Liens), with all such Liens (other than the Permitted Liens) to attach only to the proceeds of the Sale Transaction with the same priority, validity, force, and effect, if any, as they now have in or against

22

the Purchased Assets, subject to all claims and defenses the Debtors and their estates may possess with respect thereto.  The Motion or notice thereof shall be deemed to provide sufficient notice as to the sale of the Purchased Assets free and clear of all Liens (other than Permitted Liens). Following the Closing Date (as defined in the Stalking Horse Agreement), no holder of any Liens (other than the Permitted Liens) in the Purchased Assets shall have any basis to interfere with the Purchaser's use and enjoyment of the Purchased Assets based on or related to such Liens, or any actions that the Debtors may take in their chapter 11 cases, and no person may take any action to prevent, interfere with or otherwise impair consummation of the Sale Transaction contemplated in or by the Stalking Horse Agreement or this Sale Order.  For the avoidance of doubt, upon the Closing, the Debtors shall apply the proceeds of the sale of the Purchased Assets, including the Purchased Contracts, consistent with the terms of the DIP Order,[5] to pay all DIP Obligations until indefeasibly paid in full in cash.

14.     The provisions of this Sale Order authorizing the sale and assignment of the Purchased Assets free and clear of Liens and the Excluded Liabilities shall be self-executing, and neither the Debtors nor the Purchaser shall be required to execute or file releases, termination statements, assignments, consents, or other instruments in order to effectuate, consummate, and implement the provisions of this Sale Order.  However, the Debtors and the Purchaser, and each of their respective officers, employees, and agents are hereby authorized and empowered to take all actions and execute and deliver any and all documents and instruments that either the Debtors

---

[5]     "**DIP Order**", as used herein means the final order authorizing entry into the *Superpriority, Senior Secured Debtor-in-Possession Credit Agreement*, dated as of July 22, 2020, among Briggs & Stratton Corporation, as Lead Borrower, the Subsidiary Borrowers from time to time party thereto, the various Lenders and Issuing Banks (the "**DIP Lenders**"), and JPMorgan Chase Bank, N.A., as Administrative Agent and Collateral Agent (the "**DIP Agent**") [Docket No. 526].

23

or the Purchaser deem necessary or appropriate to implement and effectuate the terms of the Stalking Horse Agreement and this Sale Order.

15.     To the greatest extent available under applicable law and to the extent provided for under the Stalking Horse Agreement, the Purchaser shall be authorized, as of the Closing Date, to operate under any license, permit, registration and governmental authorization or approval of the Debtors with respect to the Purchased Assets, and, to the greatest extent available under applicable law and to the extent provided for under the Stalking Horse Agreement, all such licenses, permits, registrations, and governmental authorizations and approvals are deemed to have been transferred to the Purchaser as of the Closing Date.

16.     In furtherance of the Sale Transaction contemplated by the Stalking Horse Agreement, the Debtors shall be, and hereby are, authorized, and empowered, pursuant to sections 105, 363(b), and 365 of the Bankruptcy Code, to take all actions necessary to satisfy any and all pre-Closing covenants and conditions, including as necessary or appropriate the full or partial elimination of intercompany obligations between or among the acquired entities and the Debtors and their remaining subsidiaries, including intercompany obligations solely between or among acquired entities (whether by settlement, distribution or otherwise), including, without limitation, (i) contributing, distributing, forgiving or otherwise cancelling, directly or indirectly, any intercompany obligations owing between the acquired entities and the Debtors or the Debtors' other subsidiaries, (ii) making cash and non-cash settlements of such intercompany obligations, (iii) purchasing, selling or exchanging intercompany obligations (including issuing a new note obligation of the Debtors, directly or indirectly, in substitution or in exchange therefor, which obligation will constitute an administrative expense claim of the issuing Debtor under section 503(b) of the Bankruptcy Code), and (iv) any combination thereof.

24

17.    All of the Debtors' interests in the Purchased Assets to be acquired by the Purchaser under the Stalking Horse Agreement shall be, as of the Closing Date and upon the occurrence of the Closing, transferred to and vested in the Purchaser.  Upon the occurrence of the Closing, this Sale Order shall be considered and constitute for any and all purposes a full and complete general assignment, conveyance, and transfer of the Purchased Assets acquired by the Purchaser under the Stalking Horse Agreement or a bill of sale or assignment transferring good and marketable, indefeasible title and interest in the Purchased Assets to the Purchaser.

18.    All persons or entities, presently or on or after the Closing Date, in possession or control of some or all of the Purchased Assets are directed to surrender possession or control of the Purchased Assets to the Purchaser on the Closing Date or at such later time as the Purchaser may request.  All entities are hereby forever prohibited and enjoined from taking any action that would adversely affect or interfere with the ability of the Debtors to sell and transfer the Purchased Assets to the Purchaser in accordance with the terms of the Stalking Horse Agreement and this Sale Order.

19.    Except as expressly provided in or pursuant to the Stalking Horse Agreement, the Purchaser is not assuming and is not deemed to assume, and the Purchaser shall not be, nor shall any affiliate of Purchaser be, in any way liable for or responsible for, as a successor or otherwise, under any theory of law or equity, for any liabilities, debts, or obligations of the Debtors in any way whatsoever relating to or arising from the Debtors' ownership, possession, control, or use of the Purchased Assets prior to the consummation of the Sale Transaction contemplated by the Stalking Horse Agreement, or any liabilities calculable by reference to the Debtors or their operations or to any or all of the Purchased Assets, or relating to continuing or other conditions existing on or prior to consummation of the Sale Transaction contemplated by the Stalking Horse

25

Agreement, which liabilities, debts and obligations are hereby extinguished insofar as they may give rise to liability, successor or otherwise, against the Purchaser or any of its affiliates.

20.    For the avoidance of doubt, the bond posted by Briggs & Stratton Corporation in connection with the litigation between Briggs & Stratton Corporation and Exmark Manufacturing Co., Inc. (the "**Appeal Bond**") is not among the Purchased Assets to be sold pursuant to the Stalking Horse Agreement and the Sale Transaction is not free and clear of the interests and rights of Exmark Manufacturing, Inc. to the Appeal Bond.

**C.    Purchased Contracts**

21.    Subject to the terms of the Stalking Horse Agreement and the occurrence of the Closing Date, the assumption by the Debtors of Purchased Contracts and the assignment of all such Purchased Contracts to the Purchaser, as provided for or contemplated by the Stalking Horse Agreement, shall be, and hereby is, authorized and approved pursuant to sections 363 and 365 of the Bankruptcy Code.

22.    Notwithstanding anything to the contrary in the Bidding Procedures Order or this Sale Order, the Debtors are authorized to:

      a.    amend, amend and restate, supplement, or modify the Assumption and Assignment Notice, including, but not limited to, removing Purchased Contracts, until and through the Closing Date; and

      b.    assume and assign Purchased Contracts to the Purchaser after the Closing; *provided*, that such Purchased Contract (i) was not already assumed and assigned to the Purchaser, (ii) has not been previously rejected by the Debtors in the chapter 11 cases, and (iii) is not an Excluded Asset.

In each case, the Debtors will file and serve upon the Counterparty to such Purchased Contract a Further Amended Assumption and Assignment Notice. After the Closing Date, to the extent the Debtors lower the Cure Cost as listed in the prior Assumption and Assignment Notice in which such Purchased Contract was listed, as applicable, or add any Purchased Contract which was not

26

previously listed in the prior Assumption and Assignment Notice, as applicable, such Counterparty shall file any Cure Objection or Adequate Assurance Objection with respect to the further revised Further Amended Assumption and Assignment Notice not later than seven (7) calendar days after the date of filing and service of the Further Amended Assumption and Assignment Notice.  If a Counterparty fails to timely file with the Court and serve the Cure Objection or Adequate Assurance Objection on the Objection Notice Parties, the Counterparty shall be forever barred from asserting any objection with regard to Cure Costs or to adequate assurance of future performance of the applicable Purchased Contract.

23.     The Purchased Contracts shall be deemed valid and binding and in full force and effect and assumed by the Debtors and assigned to the Purchaser at the Closing or, to the extent the Assumption and Assignment Notice was served less than seven (7) days prior to the Closing, or after the Closing, at the end of the applicable objection period, pursuant to sections 363 and 365 of the Bankruptcy Code, subject only to the payment of all Cure Costs (as defined below) required to assume and assign the Purchased Contracts to the Purchaser, and subject to the payment of the aforementioned Cure Costs, parties to such Purchased Contracts are without basis to assert against the Purchaser, among other things, any defaults, breaches, or claims of pecuniary losses existing as of the Closing or by reason of the Closing.

24.     Upon the Closing, in accordance with sections 363 and 365 of the Bankruptcy Code, the Purchaser shall be fully and irrevocably vested with all right, title, and interest in and to each Purchased Contract.  The Debtors are authorized to take all actions reasonably necessary to effectuate the foregoing.

25.     Pursuant to sections 365(b)(1)(A) and (B) of the Bankruptcy Code, and except as otherwise provided in this Sale Order, the Purchaser shall promptly pay or cause to be paid to the

parties to any Purchased Contracts the requisite cure amounts, if any, set forth in the applicable Assumption and Assignment Notice (the "**Cure Costs**"), with respect to the assumption and assignment thereof.  The Cure Costs are hereby fixed at the amounts set forth in the applicable Assumption and Assignment Notice served by the Debtors, or the amounts determined on the record of the Sale Hearing or the applicable later hearing, as the case may be, and all parties to Purchased Contracts are forever bound by such Cure Costs, and, following the payment of the applicable Cure Costs, such parties shall not take any action against the Purchaser or the Purchased Assets, including with respect to any claim for cure under any Purchased Contract.  For the avoidance of doubt, to the extent any Purchased Contract includes liabilities that arose postpetition and have not been paid as of Closing or arise or become due and payable after Closing, subject to the terms of the Stalking Horse Agreement, such amounts will be paid in the ordinary course of business by the Purchaser.

26.    All defaults or other obligations under the Purchased Contracts arising prior to the Closing (without giving effect to any acceleration clauses or any default provisions of the kind specified in section 365(b)(2) of the Bankruptcy Code) shall be deemed cured by payment of the Cure Costs and the parties to such contracts shall be forever barred and estopped from asserting or claiming against the Debtors or the Purchaser that any additional amounts are due or other defaults exist.  Each non-Debtor party to the Purchased Contracts is forever barred, estopped, and permanently enjoined from asserting against the Debtors or Purchaser, their affiliates, successors, or assigns, or the property of any of them, any default existing as of the date of the Sale Hearing if such default was not raised or asserted prior to or at the Sale Hearing.  To the extent a non-Debtor party to the Purchased Contracts failed to timely file an objection, such Cure Cost has been

and shall be deemed to be finally determined and any such non-Debtor party shall be prohibited from challenging, objecting to, or denying the validity and finality of the Cure Cost at any time.

27.     Any provision in any Purchased Contract that purports to declare a breach, default, or payment right as a result of an assignment or a change of control in respect of the Debtors is unenforceable, and all Purchased Contracts shall remain in full force and effect, subject only to payment of the applicable Cure Cost, if any.  No sections or provisions of any Purchased Contract that purports to provide for additional payments, penalties, charges, or other financial accommodations in favor of non-Debtor third parties to Purchased Contracts shall have any force or effect with respect to the Sale Transaction contemplated by the Stalking Horse Agreement and assignments authorized by this Sale Order, and such provisions constitute unenforceable anti-assignment provisions under section 365(f) of the Bankruptcy Code or are otherwise unenforceable under section 365(e) of the Bankruptcy Code.  No assignment of any Purchased Contract pursuant to the terms of the Stalking Horse Agreement in any respect constitutes a default under any Purchased Contract.  In the absence of objection, the party to each Purchased Contract shall be deemed to have consented to such assignment under section 365(c)(1)(B) of the Bankruptcy Code, and the Purchaser shall enjoy all of the rights and benefits under each such Purchased Contract as of the applicable date of assumption without the necessity of obtaining such party's written consent to the assumption or assignment thereof.

28.     The Purchaser has satisfied any and all requirements under sections 365(b)(1) and 365(f)(2) of the Bankruptcy Code to provide adequate assurance of future performance under all Purchased Contracts.  The Purchaser shall not be required to provide any further evidence of any adequate assurance to any counterparty of a Purchased Contract.

29.     The Debtors and their estates shall be relieved of any liability for any breach of any of the Purchased Contracts occurring from and after Closing, pursuant to and in accordance with section 365(k) of the Bankruptcy Code.

30.     Parties to Purchased Contracts shall be prohibited from charging any rent acceleration, assignment fees, increases or other fees to the Purchaser as a result of the assumption and assignment of any Purchased Contract.

31.     Notwithstanding anything to the contrary in this Sale Order, (i) the rights of any party to an executory contract or unexpired lease listed on the Initial Assumption and Assignment Notice that timely filed an objection to the assumption and assignment of an executory contract or unexpired lease (excluding any objection related to adequate assurance of future performance except as otherwise agreed to between the Debtors and the objecting counterparty) to the Purchaser in accordance with the Bidding Procedures Order are preserved to the extent that any such objection has not been resolved as of the date of the entry of this Sale Order, and any such objections shall be addressed at the hearing scheduled for October 14, 2020 at 10:00 a.m. (prevailing Central Time), or a subsequent hearing, and (ii) the rights of any party to an executory contract or unexpired lease listed on the Amended Assumption and Assignment Notice are preserved and shall be addressed at the hearing scheduled for October 14, 2020 at 10:00 a.m. (prevailing Central Time), or a subsequent hearing, or otherwise as provided in the Bidding Procedures Order.

32.     Notwithstanding anything to the contrary in the Motion, the Stalking Horse Agreement, the Bidding Procedures, the Bidding Procedures Order, any Cure Notice, Supplemental Notice of Assumption and Assignment or assumption notice, any purchase agreement, or this Sale Order (i) none of the insurance policies or any related agreements

(collectively, the "**Chubb Insurance Contracts**") issued at any time by ACE American Insurance Company, Federal Insurance Company and each of their U.S.-based affiliates and successors (collectively, but exclusive of Century Indemnity Company, "**Chubb**"), or any rights, benefits, claims, rights to payments and/or recoveries under the Chubb Insurance Contracts shall be sold, assigned or otherwise transferred to the Purchaser in connection with the Sale; (ii) nothing shall alter, modify or otherwise amend the terms or conditions of the Chubb Insurance Contracts; and (iii) for the avoidance of doubt, the Purchaser is not, and shall not be deemed to be, an insured under any of the Chubb Insurance Contracts; *provided, however*, that to the extent any claim with respect to any Purchased Assets arises that is covered by the Chubb Insurance Contracts and the proceeds of the applicable Chubb Insurance Contract would be payable to the Debtors (as opposed to a third party claimant), the Debtors may pursue such claim in accordance with the terms of the Chubb Insurance Contracts, and, if applicable, turn over to the Purchaser pursuant to subsection (l) of the definition of "Acquired Assets" in section 1.1 of the Asset Purchase Agreement any such insurance proceeds (each, a "**Proceed Turnover**"); *provided, further, however*, that the Chubb Companies shall not have any duty to effectuate a Proceed Turnover or liability related to a Proceed Turnover.  For the avoidance of doubt, and without limiting the preceding sentence, from and following the Closing, none of the Debtors or their estates, or any successor thereto (including any chapter 7 trustee) or creditor thereof, shall have any right, title (other than bare legal title), or interest in the underlying economic benefit of any payments and/or recoveries in respect of any damage to or loss of the Business as a result of events or circumstances occurring prior to the Closing Date under the Chubb Insurance Contracts to the extent such claim was acquired by the Purchaser pursuant to subsection (l) of the definition of "Acquired Assets" in section 1.1 of the Asset Purchase Agreement, and any such payments and/or recoveries shall be held in trust for the

exclusive benefit of the Purchaser or its designee as a Proceed Turnover. The Debtors, their estates, and any applicable successors thereto shall execute any documents required to effectuate a Proceed Turnover as soon as reasonably practicable following receipt of any payment and/or recovery under a Chubb Insurance Contract to the extent such claim was acquired by the Purchaser pursuant to subsection (l) of the definition of "Acquired Assets" in section 1.1 of the Asset Purchase Agreement.

33.    Notwithstanding anything to the contrary in the Stalking Horse Agreement, any related documents, or this Order, and for the avoidance of doubt, (a) all liability insurance policies issued by any insurance carrier whose policy period expired before the date of the Closing (the "Subject Policies") are "Excluded Assets" under the Stalking Horse Agreement and (b) from and after the Closing, the Purchaser shall have no rights to seek or claim insurance policy benefits (defense or indemnity) under any of the Subject Policies.

34.    Notwithstanding anything to the contrary in the Stalking Horse Agreement, any related documents, or this Order, and in addition to any other document retention obligations, the Purchaser and any successor thereto or assignee thereof shall not destroy and shall reasonably make available for inspection and copying to any insurer of Briggs that is providing Briggs with a defense under any Subject Policy, on an as-requested basis, all books and records in the control of the Purchaser (or successor thereto or assignee thereof, as applicable) that are related to any liability claim against Briggs under which any such insurer is providing Briggs with a defense under any Subject Policy, including, but not limited to, historical product sales records, employment records, and facilities records, subject to any and all confidentiality agreements or privileges that may exist (except that such defending insurer reserves the right to challenge any such assertion of confidentiality and any privilege claim). Any reasonable, out-of-pocket expenses

related to the collection, copying, and delivery of such books and records shall be promptly reimbursed to Purchaser or its successor or assignee, as applicable, by the insurer or insurers requesting such books and records.

35.    Notwithstanding anything to the contrary in this Sale Order or any Cure Notice related thereto, that certain Global Health Advantage 2 to 20 (Policy #06592A), dated as of December 17, 2019, offered by Cigna Health and Life Insurance Company to Briggs & Stratton Corporation shall not be assumed and assigned to the Purchaser pursuant to this Sale Order.

36.    Whereas FR Georgia, LLC ("**FR Georgia**") asserts that the Debtors must extinguish any and all liens on the leasehold interest to cure a default under their lease, and whereas Catamount Constructors, Inc. ("**Catamount**") has asserted a lien on the leasehold in an amount of $535,278.00 and such amount includes amounts that Catamount owes to certain subcontractors Allsouth Sprinkler Company ("**Allsouth**") and Paulson-Cheek Mechanical, Inc. ("**Paulson**"), and whereas Allsouth and Paulson have asserted liens on the leasehold in amounts of $23,870.20 and $35,100, respectively, and whereas the Debtors have separately listed $535,278.00 as the amount necessary to Cure any default under the Catamount contract, and notwithstanding that the Debtors listed the amount necessary to Cure the lease with counterparty FR Georgia as $0.00, the Debtors have provided adequate assurance that they will promptly cure the lease by taking all necessary action to extinguish the liens on the property.  To the extent the Debtors, or the Purchaser, pays Catamount in full, Catamount will pay Allsouth and Paulson in full satisfaction of their respective liens and the liens of Catamount, Allsouth, and Paulson shall be deemed extinguished.

**D.    Global Settlement[6]**

---

[6]    To the extent not otherwise defined within this section D, capitalized terms shall have the meanings ascribed to them in the DIP Order.

37.     The Debtors, the Purchaser, the Committee, the Pension Benefit Guaranty Corporation (the "**PBGC**"), the DIP Agent, and the other DIP ABL Secured Parties agree to the following terms in resolution of the Committee's and the PBGC's potential objections to the Motion and other actual or potential disputes in connection therewith, and all such terms are hereby approved by the Court pursuant to this Sale Order:

a.      The Purchaser has agreed to assume sponsorship of The Briggs & Stratton Cash Balance Retirement Plan as of the Closing Date pursuant to the Stalking Horse Agreement (as amended), including the Debtors' agreement to contribute $1.6 million to The Briggs & Stratton Cash Balance Retirement Plan prior to the Closing Date in accordance therewith. [7]

b.      The Purchaser agrees that the consummation of the Settlement Agreement, dated on or around September 15, 2020, shall satisfy the condition set forth in Section 7.1(i) of the Stalking Horse Agreement.

c.      The Briggs & Stratton Pension Plan shall be terminated by mutual agreement of the PBGC and the Debtors as of a date such parties agree to, as may be set forth in a stipulation between the PBGC and the Debtors entered into promptly after the entry of this Order, and the PBGC shall assume sponsorship of the Pension Plan as of such date.

d.      The PBGC's only claim or recourse against the Debtors and their estates, inclusive of any right to a claim for plan termination premiums under ERISA Section 4006, shall be an allowed general unsecured claim estimated to be no more than $225 million.

e.      The PBGC agrees to support a chapter 11 plan where the first $5 million of amounts it would otherwise recover under the plan based on a pro rata distribution shall be waived and subordinated for the benefit of the Debtors' other general unsecured creditors (excluding the PBGC); provided, however, that in no event shall a general unsecured creditor receive more than the amount of its allowed claim.

f.      The Debtors agree not to take any action, or refrain from taking any action, to intentionally interfere with or jeopardize the general

---

[7] The Purchaser may instead elect to fund the $1.6 million itself with a resulting Purchase Price deduction.

unsecured creditor recoveries based on "Net Proceeds" referenced in the Debtors' Estimated Net Proceeds and Closing Date Sensitivity analysis, dated September 7, 2020, and any additional upside thereto (the "**Distributable Value Analysis**").

g.     The Debtors and the Committee shall work in good faith on a chapter 11 plan that facilitates, implements, and otherwise gives effect to the settlement based on Distributable Value Analysis.

h.     Upon the consummation of the Sale Transaction, the repayment in full in cash of all DIP Obligations then outstanding on the closing date other than the LC Obligations (as defined in the DIP Credit Agreement) and the Released Obligations (as defined below), the cash collateralization (or letter of credit backstop to the extent agreed in writing by the DIP Agent) of all LC Obligations in accordance with the DIP Credit Agreement, and the termination of all Commitments (as defined in the DIP Credit Agreement), (i) the amount of DIP Obligations the Debtors are required to repay the DIP ABL Secured Parties on account of the consummation of the Sale Transaction shall be reduced by $800,000 (the "**Released Obligations**"), (ii) the DIP ABL Secured Parties forever waive and release any right or claim to the Released Obligations for all purposes of the DIP Credit Agreement and the other DIP Loan Documents, including any subordination or waterfall provisions thereunder, and (iii) notwithstanding anything to the contrary in the DIP Order or DIP Credit Agreement, no amount shall be owed by the DIP Term Secured Parties to the DIP ABL Secured Parties in respect of the Released Obligations.  Notwithstanding anything to the contrary in this paragraph h or otherwise, each DIP ABL Lender shall have the right to characterize its Released Obligations as a reduction of DIP Obligations constituting principal, interest or fees, or any combination thereof, in its discretion; *provided*, such treatment shall not be binding on the Debtors for tax purposes.  The Released Obligations shall count towards the "Net Proceeds" referenced in the Debtors' Distributable Value Analysis for funding the administrative expenses of the chapter 11 cases and for distributions to creditors.

i.     Upon the consummation of the Sale Transaction, the Committee and each of its members in their individual creditor capacities each shall be deemed to have irrevocably agreed to (i) fully and forever waive and release their respective rights to directly or indirectly assert or prosecute, or encourage or support any other party in asserting or prosecuting, any Challenge (as defined in the DIP Order) against any of the Prepetition Secured Parties, the DIP ABL Secured Parties, any of their respective affiliates, subsidiaries, successors or assigns,

or any agents, directors, officers, employees, representatives, and advisors of each of the foregoing parties (each, a "**Challenge**," and all such released parties, collectively, the "**ABL Released Parties**"); and (ii) finally and forever release and discharge, and covenant not to sue on account of, any and all claims and causes of action that now exist or may arise in the future against the DIP Secured Parties, solely in their capacities as such (including the ABL Released Parties, solely in their capacities as such) in connection with any matter related to any of the Prepetition ABL Obligations, the Prepetition Collateral, the DIP Obligations, or the DIP Collateral; *provided*, *however*, the Committee's rights to review and object to the payment of Lender Professional Fees (including, without limitation, the DIP Agent Expenses (as defined below) or in connection with any dispute regarding return of the Challenge Reserve Funds (as defined below) shall be excluded from the foregoing release and shall be fully preserved; provided, further, that the Committee's rights to enforce the terms of this Sale Order shall be fully preserved.

j.       As further security for repayment of fees, costs and expenses of the DIP Agent's professionals during these Cases, including pursuant to Paragraph 31 of the DIP Order and the expense reimbursement and indemnification provisions set forth in the DIP Credit Agreement (collectively, the "**DIP Agent Expenses**"), the Debtors shall escrow $137,500 each week through the week ending October 16, 2020, and $104,000 each week thereafter until the effective date of a chapter 11 plan that provides for the indefeasible payment in full in cash of all DIP Obligations (the "**DIP Agent Escrowed Funds**").  The Debtors shall use the DIP Agent Escrowed Funds solely to repay DIP Agent Expenses as and when due and payable pursuant to the DIP Order and DIP Credit Agreement. Upon the payment in full in cash of all DIP Agent Expenses invoiced for a particular period, the Debtors shall be permitted to release any unused DIP Agent Escrowed Funds that were escrowed to cover such particular period.

k.       If the Sale Transaction is not consummated on or prior to September 27, 2020 or a later date as agreed to by the Debtors, the Purchaser, the DIP Agent, the PBGC and the Committee, (a) this Sale Order shall be null and void in all respects; (b) any settlements, compromises, rights, or authorizations embodied in or appurtenant to this Sale Order, and any document or agreement executed pursuant to or in connection with this Sale Order shall be null and void; (c) all proceedings relating to the Motion shall be restored to status quo ante as of immediately prior to entry of the Sale Order; and (d) nothing contained in the Sale Order or otherwise shall (i) constitute a waiver or release of any claims, interests, or causes of

action of any party, including the amount of the Released Obligations or any rights or claims of the DIP ABL Secured Parties (ii) prejudice in any manner the rights of the Debtors, the Purchaser or its affiliates, the PBGC, the DIP ABL Secured Parties, the Committee, any holder of claim or interest, or any other entity, including with respect to the amount of the Released Obligations or any rights or claims of the DIP ABL Secured Parties or (iii) constitute an admission, acknowledgment, offer, or undertaking of any sort by the Debtors, the Purchaser, the PBGC, the Committee, the DIP ABL Secured Parties, any holder of claim or interest, or any other entity in any respect; *provided, however*, that the Debtors, the Purchaser, the DIP Agent and the Committee shall settle an order, reasonably acceptable in form and substance to such parties, on two business (2) days' notice with respect to scheduling a hearing on the Motion, the filing of any objections to the Motion, and any related filings and or responses to objections to the Motion, which order shall propose a further hearing on the Motion for a date not later than one week after September 27, 2020 or such later date as agreed to by the Debtors, the DIP Agent and the Committee, subject to the availability of the Court.

l.      In addition to, and without limiting, the foregoing, solely in the event that any Challenge is asserted against any of the ABL Released Parties, the Debtors shall, within three (3) Business Days of receiving written notice of such Challenge from the DIP Agent, remit to the Agent $1,500,000 in cash (the "**Challenge Reserve Funds**") as further security for repayment of any indemnification claims, fees, costs and expenses of the DIP Secured Parties and Prepetition Secured Parties arising under the DIP Order or the DIP Documents, until all such Challenges, if any, are finally settled or adjudicated pursuant to a final, non-appealable order of this Court. The DIP Agent shall maintain the Challenge Reserve Funds in an account in the DIP Agent's name and shall use Challenge Reserve Funds to satisfy such claims referenced in this subsection (l) as and when due and payable pursuant to the DIP Order and DIP Documents; provided, that any unused Challenge Reserve Funds shall be promptly paid to the Debtors after satisfaction in full of any claims referenced in this subsection, upon final settlement or adjudication of all Challenges pursuant to a final, non-appealable order of this Court.

m.      Nothing in this Paragraph 37 shall in any way (i) limit the rights of the DIP ABL Secured Parties or the Prepetition Secured Parties to seek and obtain an order of this Court requiring that additional Challenge Reserve Funds be remitted to the DIP ABL Agent or the rights of any other party-in-interest to object to such relief or (ii)

otherwise limit, alter, impair or modify any rights, remedies, privileges, interest, claims or protections of the DIP Secured Parties and Prepetition Secured Parties, respectively, set forth in the DIP Documents and the DIP Order, including, without limitation, the liens and superiority administrative claims granted to the DIP ABL Secured Parties and Prepetition Secured Parties thereby.

n.    Upon the consummation of the Sale Transaction, all causes of action under chapter 5 of the Bankruptcy Code and any similar or related state laws are hereby waived, released, relinquished, settled and discharged, unconditionally, irrevocably and forever, including, without limitation by the Debtors, any remaining Debtors after the consummation of the Sale Transaction, any liquidation trust or liquidation trustee in these Cases, or chapter 7 trustee, each of the DIP ABL Secured Parties and the Purchaser (in the Purchaser's case, solely to the extent such causes of action under chapter 5 of the Bankruptcy Code and any similar or related state laws are Acquired Assets under the Stalking Horse Agreement) and each of such party's respective affiliates, subsidiaries, successors, assigns, agents, directors, officers, employees, representatives, and advisors in each case, solely in their respective capacities as such ("**Related Parties**") and each such party and each of their Related Parties covenants not to sue holders of general unsecured claims for any causes of action under chapter 5 of the Bankruptcy Code and any similar or related state laws (including during the period leading up to the consummation of the Sale Transaction).

o.    The Committee professionals' fee cap in the DIP Budget approved in the DIP Order shall be increased from $1 million in the aggregate per month for all Committee professionals to $1.5 million in the aggregate per month for all Committee professionals.

p.    The Debtors' supplement to the Motion dated August 28, 2020 [Docket No. 628] (the "**Supplement**") is withdrawn without prejudice and shall be deemed withdrawn with prejudice as of the Closing.

E.    **Additional Provisions**

38.    Each and every federal, state, and local governmental agency or department is hereby authorized and directed to accept any and all documents and instruments necessary and appropriate to consummate the Sale Transaction contemplated by the Stalking Horse Agreement and this Sale Order.

39.     To the maximum extent permitted by section 525 of the Bankruptcy Code, no governmental unit may revoke or suspend any permit or license relating to the operation of the Purchased Assets sold, transferred, or conveyed to the Purchaser on account of the filing or pendency of the Debtors' chapter 11 cases or the consummation of the Sale Transaction contemplated by the Stalking Horse Agreement.

40.     The Purchaser has not assumed, or is otherwise not obligated for, any of the Debtors' obligations, debts (as defined in section 101(12) of the Bankruptcy Code), or liabilities other than the Assumed Liabilities, and as otherwise set forth in the Stalking Horse Agreement, and the Purchaser has not purchased any of the Excluded Assets (as defined in the Stalking Horse Agreement) or assumed any Excluded Liabilities.  Consequently, all persons and governmental units (as defined in sections 101(27) and 101(41) of the Bankruptcy Code, respectively) and all holders of Liens (other than Permitted Liens) based upon, arising out of or related to liabilities retained by the Debtors shall not take any action against the Purchaser or the Purchased Assets, including asserting any setoff (to the extent not actually taken prepetition) or right of subrogation of any kind, to recover any Liens (other than Permitted Liens) or on account of any liabilities of the Debtors other than Assumed Liabilities pursuant to the Stalking Horse Agreement. Additionally, all persons holding or asserting any Liens in the Excluded Assets shall not assert or prosecute such Liens or any cause of action against the Purchaser or the Purchased Assets for any liability associated with the Excluded Assets.

41.     The Purchaser is not a "successor" to the Debtors or their estates by reason of any theory of law or equity, and the Purchaser shall not assume, be deemed to assume, or in any way be responsible for any liability, debt (as defined in section 101(12) of the Bankruptcy Code), or obligation of any of the Debtors or their estates including, without limitation, pursuant to any bulk

39

sales law, successor liability, or other theory of liability or responsibility for any claim against the Debtors, against an insider of the Debtors, against the Purchased Assets, or similar liability except as otherwise expressly provided in the Agreement.  The Motion contains sufficient notice of such limitations in accordance with the Local Rules.  Neither the purchase of the Purchased Assets by the Purchaser or its affiliates, nor the fact that the Purchaser or its affiliates are using any of the Purchased Assets previously owned, used, or operated by the Debtors, will cause the Purchaser or any of its affiliates to be deemed a successor to, or be otherwise liable in any respect on account of the Debtors' business within the meaning of:  (i) any foreign, federal, state or local revenue, pension, ERISA, tax, labor, employment, antitrust, regulatory, investigatory, safety, consumer protection, patent or intellectual property, business practices, environmental or other law, regulation, rule, guideline, or other doctrine (including, without limitation, filing requirements under any such laws, regulations, rules, guidelines, or other doctrines); (ii) any employment or labor agreements, consulting agreements, severance arrangements, change-in-control agreements, or other similar agreement to which the Debtors are a party; (iii) any welfare, compensation, or other employee benefit plans, agreements, practices, and programs, including, without limitation, any pension plan of the Debtors; (iv) the cessation of the Debtors' operations, dismissal of employees, or termination of employment or labor agreements or pension, welfare, compensation, retention, incentive, or other employee benefit plans, agreements, practices and programs, or obligations that might otherwise arise from or pursuant to (a) ERISA, (b) the Fair Labor Standards Act, (c) Title VII of the Civil Rights Act of 1964, (d) the Federal Rehabilitation Act of 1973, (e) the National Labor Relations Act, (f) the Worker Adjustment and Retraining Notification Act, or any similar federal, state or other applicable law, (g) the Age Discrimination in Employment Act of 1967, as amended, (h) the Americans with Disabilities Act of 1990, as amended, (i) the

40

Consolidated Omnibus Budget Reconciliation Act of 1985, (j) the Multiemployer Pension Plan Amendments Act of 1980, (k) any employment, wage and hour restriction, equal opportunity, discrimination, immigration, or naturalization laws, (l) state and local unemployment compensation laws or other similar state and local laws, (m) any workers' compensation or other employee health, accident, disability, occupational disease, or safety claims, (n) salaries, wages, benefits, expenses, or other compensation or remuneration, and (o) any other state, local, or federal employee benefit laws, regulations or rules or other state, local or federal laws, regulations, or rules relating to wages, benefits, employment, or termination of employment with the Debtors; (v) any other actions, suits, proceedings, claims, investigations applications, or complaints related to the foregoing; (vi) any unemployment or workers' compensation experience ratings; (vii) any liabilities, debts, or obligations of or required to be paid by the Debtors for any taxes of any kind for any period other than taxes relating to the Acquired Assets; (viii) any liabilities, debts, commitments, or obligations for any taxes relating to the Acquired Assets prior to the Closing; (ix) any claims asserted or that could be asserted in any litigation; (x) any liability incurred by a Debtor, its directors, officers, stockholders, equity holders, agents, or employees on or after the Closing Date; (xi) any products liability or product warranty law, regulation, rule, guideline, or other doctrine with respect to the Debtors' actual or potential liability under such law, regulation, rule, guideline, or doctrine; (xii) any environmental laws, rules, or regulations, including, without limitation, under the Comprehensive Environmental Response, Compensation, and Liability Act or similar state statutes (other than that which is imposed as a matter of law on owners of real estate); or (xiii) any liability relating to any Excluded Asset.  For the avoidance of doubt, the Purchaser shall not have any liabilities, debts, commitments or obligations for any taxes relating

to the operation of the Purchased Assets prior to Closing, except to the extent the Purchaser expressly assumes such taxes pursuant to the Stalking Horse Agreement.

42.    Except to the extent expressly included in the Assumed Liabilities or to enforce the Agreement or Permitted Liens, pursuant to sections 105 and 363 of the Bankruptcy Code, all persons and entities, including, but not limited to, the Debtors, the Committee, all debt security holders, equity security holders, the Debtors' employees or former employees, governmental, tax and regulatory or investigatory authorities of any sort (including, without limitation, environmental and product safety regulators or investigators), lenders, parties to or beneficiaries under any benefit plan, trade and other creditors asserting or holding a Lien or other claim of any kind or nature whatsoever against, in or with respect to any of the Debtors or all or any part of the Purchased Assets (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or noncontingent, senior or subordinated), arising under or out of, in connection with, or in any way relating to the Debtors, all or any part of the Purchased Assets, the operation of the Debtors' business prior to the Closing Date or the transfer of the Purchased Assets to the Purchaser, shall be forever barred, estopped, and permanently enjoined from asserting, prosecuting or otherwise pursuing such Lien or other claim, whether by payment, setoff (to the extent not actually taken prepetition), or otherwise, directly or indirectly, against the Purchaser or any affiliate, successor or assign thereof, or against the Purchased Assets.

43.    Subject to the terms of the Stalking Horse Agreement, the Stalking Horse Agreement and any related agreements may be waived, modified, amended, or supplemented by agreement of the Debtors and the Purchaser, without further action or order of the Court; *provided*, *however*, that any such waiver, modification, amendment, or supplement is not material and substantially conforms to, and effectuates, the Stalking Horse Agreement and any related

agreements, including the Global Settlement set forth in paragraph 37 of this Sale Order; and *provided*, *further*, that the Debtors shall provide advance written notice to the Committee and DIP Agent of any such waiver, modification, amendment, or supplement to the Stalking Horse Agreement.

44.     The failure specifically to include any particular provisions of the Stalking Horse Agreement or any related agreements in this Sale Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court, the Debtors, and the Purchaser that the Stalking Horse Agreement and any related agreements are authorized and approved in their entirety with such amendments thereto as may be made by the parties in accordance with this Sale Order prior to Closing.

45.     No bulk sale law, bulk transfer law, or any similar law of any state or other jurisdiction shall apply in any way to the sale and the Sale Transaction contemplated by the Stalking Horse Agreement, the Motion, or this Sale Order.

46.     To the extent any provisions of this Sale Order conflict with the terms and conditions of the Stalking Horse Agreement, this Sale Order shall govern and control.

47.     This Sale Order and the Stalking Horse Agreement shall be binding upon and govern the acts of all persons and entities, including without limitation, the Debtors and the Purchaser, their respective successors and permitted assigns, including, without limitation, any chapter 11 trustee hereinafter appointed for the Debtors' estates or any trustee appointed in a chapter 7 case if this case is converted from chapter 11, all creditors and shareholders of any Debtor (whether known or unknown), filing agents, filing officers, title agents, recording agencies, secretaries of state, and all other persons and entities who may be required by operation of law, the duties of their office or contract, to accept, file, register, or otherwise record or release any

documents or instruments or who may be required to report or insure any title in or to the Purchased Assets.

48.     The provisions of this Sale Order are nonseverable and mutually dependent.

49.     Nothing in any order of this Court or contained in any chapter 11 plan or liquidation confirmed in these chapter 11 cases, or in any subsequent or converted cases of the Debtors under chapter 7 or chapter 11 of the Bankruptcy Code, shall conflict with or modify the provisions of the Stalking Horse Agreement or the terms of this Sale Order.

50.     The Purchaser shall not be required to seek or obtain relief from the automatic stay under section 362 of the Bankruptcy Code to deliver any notice provided for in the Stalking Horse Agreement or any other Sale-related document or take any and all actions permitted under the Stalking Horse Agreement or any other Sale Transaction-related document in accordance with the terms and conditions thereof.  The automatic stay imposed by section 362 of the Bankruptcy Code is hereby modified to the extent necessary to implement the preceding sentence.

51.     The Debtors are authorized and directed to take all actions necessary to implement and effectuate the relief granted in this Sale Order in accordance with the Stalking Horse Agreement.

52.     Notwithstanding the possible applicability of Bankruptcy Rules 6004, 6006, 7062, or otherwise, this Court, for good cause shown, orders that the terms and conditions of this Sale Order shall be effective and enforceable immediately upon entry and its provisions shall be self-executing, and the Motion or notice thereof or of this Sale Order shall be deemed to provide sufficient notice of the Debtors' request for waiver of the otherwise applicable stay of this Sale Order.  In the absence of any person or entity obtaining a stay pending appeal, the Debtors and the Purchaser are free to close under the Stalking Horse Agreement at any time, subject to the terms

44

of the Stalking Horse Agreement.  The Purchaser has acted in "good faith," and, in the absence of

any person or entity obtaining a stay pending appeal, if the Debtors and the Purchaser close under

the Stalking Horse Agreement, then the Purchaser shall be entitled to the protections of section

363(m) of the Bankruptcy Code as to all aspects of the Sale Transaction under and pursuant to the

Agreement if this Sale Order or any authorization contained herein is reversed or modified on

appeal.

53.     The Debtors, the Committee, the Purchaser, and the DIP Secured Parties and

Prepetition Secured Parties each have standing to enforce the terms of this Sale Order, and,

notwithstanding any closure of any of the Debtors' chapter 11 cases, the Debtors, the Committee,

or the Purchaser may seek to reopen any closed chapter 11 cases to the extent necessary to enforce

the terms of this Sale Order.

54.     Notwithstanding anything to the contrary in the Bidding Procedures Order, this Sale

Order, or the Stalking Horse Agreement, to the extent that that certain *Master Trademark License*

*Agreement*, dated February 1, 2018, by and between Briggs & Stratton Corporation and Stanley

Black & Decker, Inc., as amended by the *First Amendment to Master Trademark License*

*Agreement*, dated March 1, 2019, and the *Second Amendment to Master Trademark License*

*Agreement*, dated, September 23, 2019, the *Product Agreement*, dated November 15, 2019,

between Black & Decker (U.S.), Inc. and Briggs & Stratton Corporation, or such other contracts

between Debtors and Stanley Black & Decker, Inc. and its affiliates (collectively, the "**Stanley**

**Contracts**") is assumed and assigned to the Purchaser and the Stanley Contracts include liabilities

that arise after the September 15, 2020 Sale Hearing, or that have accrued prior to the Sale Hearing,

but will not become due and payable until after the Sale Hearing under the terms of the Stanley

45

Contracts, such amounts will be paid in the ordinary course of business and pursuant to the terms of the Stanley Contracts by the Stalking Horse Bidder.

55.    Notwithstanding anything to the contrary contained in the Bidding Procedures Order, this Sale Order, the Stalking Horse Agreement, or any transition services agreement, to the extent that Infor (US), Inc. ("**Infor**") does not provide prior written consent to the assumption and assignment of that certain Software License Agreement, dated October 11, 2011, by and between Infor (US), Inc. and Briggs & Stratton Corporation (the "**Infor Agreement**") by the Closing Date, the Infor Agreement shall not be deemed a Purchased Contract at the Closing and the Purchaser shall not use or benefit from Infor's software licensed under the Infor Agreement to Briggs & Stratton Corporation; provided, subject to Infor's prior written consent to the assumption and assignment, nothing in this Paragraph 55 shall limit the Debtors' ability to assume and assign the Infor Agreement to the Purchaser after the Closing.

56.    Notwithstanding anything to the contrary in the Motion, the Stalking Horse Agreement, the Bidding Procedures, the Bidding Procedures Orders, any Cure Notice, Supplement Notice of Assumption and Assignment, any purchase agreement, this Order and any documents related to the foregoing, to the extent that Jones Plastic & Engineering Company, LLC, Ataco Steel Products Corporation, Davis Tool & Die Co., Inc. and/or Poplar Bluff Tool & Die Co., Inc. (collectively, the "**Possessory Lien Claimants**") possess valid, perfected liens on the molds, dies, tools and other collateral in their respective possession, said liens shall be deemed to be Permitted Liens, hereunder, which shall survive the Sale Transaction.  Moreover, to the extent they have valid, perfected, statutory or common law liens, the Possessory Lien Claimants shall not be required to surrender the molds, dies, tools and other collateral in their respective possession to the Purchaser at or after closing or assignment of any contract of the Possessory Lien Claimants

46

to the extent applicable non-bankruptcy law provides them the right to retain such collateral.  In the event any one or more contracts between the Debtors and one or more of the Possessory Lien Claimants is assumed and assigned by Debtors, any and all pre-petition and post-petition sums due and owing to the Possessory Lien Claimants, including but not limited to past due amounts, work in process, raw materials and specialty finished goods, shall be paid in full promptly after the later of (i) final reconciliation of such amounts, whether by order or agreement of the parties and (ii) the date such amounts become due and payable under the relevant contract. In the event any one or more contracts between the Debtors and one or more of the Possessory Lien Claimants is rejected, all valid, allowed, secured (as determined under applicable non-bankruptcy law) amounts due and owing to the Possessory Lien Claimants under the rejected contract, whether pre-petition or post-petition and including but not limited to past due amounts and any work in process, raw materials and specialty finished goods, shall be paid to the respective Possessory Lien Claimants in accordance with a chapter 11 plan or as otherwise determined by Court order, provided, however, to the extent post-petition, pre-rejection amounts become due and payable, any such undisputed sums shall be paid in the ordinary course. Finally, the various molds, dies, tools and other assets listed on Exhibit "2" to the Limited Objection of Poplar Bluff Tool & Die Co. Inc. to the Motion to the extent not property of the estate, shall be excluded from the sale or imposition of any lien of Debtors' creditors;  the Debtors and the Purchaser reserve the right to object to the priority, perfection, validity, extent of and amount of any lien or claim asserted by the Possessory Lien Claimants, and in the event the Possessory Lien Claimants' contracts are rejected, the claimed amount due and owing.

57.    Nothing in this Sale Order or related documents discharges, releases, precludes, or enjoins: (i) any liability to any governmental unit as defined in 11 U.S.C. § 101(27)

("**Governmental Unit**") that is not a "claim" as defined in 11 U.S.C. § 101(5) ("**Claim**"); (ii) any Claim of a Governmental Unit arising on or after the Closing Date; (iii) any liability to a Governmental Unit under police and regulatory statutes or regulations that any entity would be subject to as the owner or operator of the Purchased Assets after the Closing Date; or (iv) any liability to a Governmental Unit on the part of any person other than the Debtors.  Nor shall anything in this Sale Order enjoin or otherwise bar a Governmental Unit from asserting or enforcing, outside of this Court, any liability described in the preceding sentence.  Nothing in this Sale Order or related documents authorizes the transfer or assignment of any governmental (a) license, (b) permit, (c) registration, (d) authorization, or (e) approval, or the discontinuation of any obligation thereunder, without compliance with all applicable legal requirements and approvals under police or regulatory law.  Nothing in this Sale Order shall relieve any entity from any obligation to address or comply with information requests or inquiries from any Governmental Unit.  Nothing in this Sale Order shall affect any setoff or recoupment rights of any Governmental Unit.  Nothing in this Sale Order divests any tribunal of any jurisdiction it may have under police or regulatory law to interpret this Sale Order or to adjudicate any defense asserted under this Sale Order.  For the avoidance of doubt, the matters preserved by this paragraph are subject to all rights and defenses available under applicable law.

58.     This Court shall retain exclusive jurisdiction to enforce the terms and provisions of this Sale Order, the Bidding Procedures Order, and the Stalking Horse Agreement in all respects and to decide any disputes concerning this Sale Order, the Bidding Procedures Order, or the Stalking Horse Agreement, or the rights and duties of the parties hereunder or thereunder or any issues relating to the Stalking Horse Agreement and this Sale Order including, but not limited to, the interpretation of the terms, conditions and provisions hereof and thereof, the status, nature and

extent of the Purchased Assets, including any Purchased Contracts, and any and all issues and disputes arising in connection with the relief authorized herein, inclusive of those concerning the transfer of the Purchased Assets free and clear of all Liens (other than Permitted Liens).

59.    Not later than two (2) business days after the date of this Sale Order, the Debtors shall serve a copy of the Sale Order on the Notice Parties and shall file a certificate of service no later than twenty-four (24) hours after service.

DATED:  September 15, 2020
St. Louis, Missouri

cke

Barry S. Schermer
United States Bankruptcy Judge

**Order Prepared By:**

Robert E. Eggmann, #37374MO
Christopher J. Lawhorn, #45713MO
Thomas H. Riske, #61838MO
**CARMODY MACDONALD P.C.**
120 S. Central Avenue, Suite 1800
St. Louis, Missouri 63105
Telephone:  (314) 854-8600
Facsimile: (314) 854-8660
Email: ree@carmodymacdonald.com
         cjl@carmodymacdonald.com
         thr@carmodymacdonald.com

-and-

Ronit J. Berkovich (admitted *pro hac vice*)
Debora A. Hoehne (admitted *pro hac vice*)
Martha E. Martir (admitted *pro hac vice*)
**WEIL, GOTSHAL & MANGES LLP**
767 Fifth Avenue
New York, New York 10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007
Email:  Ronit.Berkovich@weil.com
          Debora.Hoehne@weil.com
          Martha.Martir@weil.com

*Counsel to the Debtors and*
*Debtors in Possession*