**UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION**

| | | |
|---|---|---|
| **In re** | § | **Chapter 11** |
| | § | |
| **BRIGGS & STRATTON** | § | **Case No. 20-43597-399** |
| **CORPORATION,** *et al.,* | § | |
| | § | **(Jointly Administered)** |
| **Debtors.** | § | |
| | § | Related Docket No. 2000 |
| | § | Hearing Date: January 13, 2022 |
| | § | Hearing Time: 2:00 p.m. (CT) |

**RESPONSE TO PLAN ADMINISTRATOR'S OBJECTION TO CREDITOR
DANTHERM S.p.A.'s RECLAMATION CLAIM IN AMENDED CLAIM NO. 53-3**

Dantherm S.p.A. ("**Dantherm**"), by its undersigned counsel, for its response (the "**Response**") to the Plan Administrator's (the "**Plan Administrator**") objection (the "**Objection**") to Dantherm's reclamation claim (the "**Reclamation Claim**") asserted in Dantherm's amended proof of claim No. 53-3 (the "**Amended POC**") respectfully states as follows:

**Preliminary Statement**

1. Contrary to the Plan Administrator's contention, the secured claims which were senior to the Reclamation Claim as of the Petition Datewere not paid from the proceeds realized by the Debtors upon closing of the Sale Transaction.[1] Rather, the Prepetition ABL Obligations were paid in full after entry of this Court's final order approving and authorizing the DIP Facility. Neither the goods which are the subject of the Reclamation Claim, nor the proceeds thereof, were used to pay the Prepetition ABL Obligations.

---

[1] Capitalized terms used herein shall have the meanings ascribed to them in papers filed and orders entered in these chapter 11 cases.

1

2. The Debtors and the DIP Lenders had notice of the Reclamation Claim several days prior to the entry of the final order authorizing and approving the DIP Loans.

3. Upon payment if full of the Prepetition ABL Obligations, the Reclamation Claim was no longer subordinate to the security interests of the Prepetition Secured Parties. Moreover, at all material times, Dantherm's rights and interests in connection with the Reclamation Claim were senior to the DIP Liens subsequently granted to the DIP Lenders.

4. Contrary to the Plan Administrator's contention, the issue presented here does not involve the tracing of proceeds realized from the Sale Transaction because proceeds from the goods Dantherm sold to Debtor Allmand Bros., Inc. ("**Allmand**") which constitute the Reclamation Claim were not used to pay the Prepetition ABL Obligations.

5. As demonstrated below, Dantherm held a first priority interest in the proceeds realized from the sale of Allmand's property, including inventory, above the claims of all other creditors, including the DIP Lenders.

6. The Objection should be overruled. In accordance with the Debtors' confirmed plan of liquidation (the "**Plan**") and applicable law, the Reclamation Claim in the undisputed amount of $517,754.98 should be allowed and paid in full.

## The Unique Business Relationship Among Dantherm and Allmand

7. In 1948, Dantherm, with its headquarters based in Italy, became the worldwide pioneer in the design, development, and manufacture of diesel portable air-heaters.

8. Years later, Allmand became recognized as one of the largest international manufacturers of trailers utilizing diesel portable air-heaters.

9. Beginning in 2014, Dantherm and Allmand commenced a unique relationship pursuant to which Dantherm designed and manufactured diesel air-heaters for the specific use by

2

Allmand in the manufacture of trailers. This was essential to Allmand's business because Dantherm's patented products enable Allmand's trailers to be utilized anywhere in the world regardless of disparate temperature and weather conditions.

10. Over the years, Dantherm modified its portable air-heaters to correspond with Allmand's update of the trailers it manufactures and sells to customers throughout the world.

11. Prior to the Petition Date, all of the latest design of Allmand's Maxi Heat trailers were equipped with diesel portable air-heaters specifically designed and manufactured by Dantherm to fulfill Allmand's needs. The diesel portable air-heaters are readily identifiable and bear the trademarks of both Dantherm and Allmand.

12. Given the uniqueness of this relationship, at Allmand's request, Dantherm agreed not to sell diesel portable air-heaters designed for Allmand's purposes to any of Allmand's competitors.

13. Over the years, the practice development pursuant to which in or about February of each year, Allmand would provide Dantherm with a forecast of the number of air-heaters Allmand expected to purchase during the next 12 months. Dantherm would then commence production of a large percentage of the budgeted air-heaters and arrange for their shipment by ship and by rail to Allmand's plant in Nebraska, a process that would take several months.

14. Because the Petition Date occurred on July 21, 2020, the foregoing course of dealings resulted in over $3 million in goods being delivered to Allmand shortly before the Petition Date, with $2,566,331.20 of that amount being delivered within the 45-day reclamation period set forth in § 546(c) of the Bankruptcy Code.

**Pertinent Postpetition Events**

15. The Debtors filed a few dozen First Day Motions on the Petition Date, including the following:

- A motion styled in part ". . . Approving Manner of Service of Notice of Case Commencement" [Docket No. 18];

- *Motion of Debtors for Interim and Final Orders (I) Authorizing Debtors to Pay Prepetition Obligations in the Ordinary Course of Business to (A) Critical Vendors, (B) Foreign Creditors, and (C) 503(b)(9) Claimants; and (II) Granting Related Relief* [Docket No. 30] (the "**Critical Vendor Motion** "); and

- *Motion of Debtors for Interim and Final Orders (I) Authorizing Debtors to Obtain Postpetition Financing, (II) Authorizing Debtors to Use Cash Collateral, (III) Granting Liens and Superpriority Claims, (IV) Granting Adequate Protection to Prepetition Secured Parties, and (V) Modifying Automatic Stay* [Docket No. 35] (the "**DIP Facility Motion**").

16. Dantherm was not served with copies of the First Day Motions.

17. An order granting the DIP Facility Motion on an interim basis was entered on July 21, 2020 [Docket No. 123]. Among the Court's extensive findings and rulings in the interim order were (a) the prepetition collateral had a value greater than the Prepetition ABL Obligations [¶7(d)]; "no proceeds of the DIP ABL Loans shall be used during the Interim Period (as defined below) to repay Prepetition ABL Obligations [¶ 10(b)]; and the Prepetition ABL Obligations shall be paid upon entry of a final order on the DIP Facility Motion [¶ 10(c)].

18. Pursuant to the Court's approval of the manner of giving notice of case commencement in light of the thousands of creditors of these estates located throughout the world, Dantherm eventually received notice of these cases. On August 9, 2020, Dantherm had engaged undersigned counsel to represent its interests in these cases and provided counsel with copies of documents evidencing Dantherm's prepetition claims.

4

19. Upon realizing Dantherm had a substantial prepetition claim, the vast majority of which fell within the 45-day period under § 546(c) of the Bankruptcy Code, coupled with the fact that August 9, 2020 was the last day to timely make a demand for reclamation pursuant to the Bankruptcy Code, counsel served a demand for reclamation on the Debtors on August 9, 2020.

20. Two days later, on August 11, 2020, counsel filed herein a notice of the reclamation demand in the amount of $2,566,331.20 [Docket No. 358], and appended thereto the 64-page demand letter served on the Debtors which included all documents evidencing the amount of the reclamation demand, a copy of which is incorporated herein by this reference.

21. On August 11, 2020, Dantherm also filed its *Limited Objection and Reservation of Rights of Dantherm S.p.A. to Motion of Debtors for Interim and Final Orders (I) Authorizing Debtors to Pay Prepetition Obligations in the Ordinary Course of Business to (A) Critical Vendors, (B) Foreign Creditors, and (C) 503(b)(9) Claimants; and (II) Granting Related Relief* [Docket No. 356] (the "**Critical Vendor Motion Objection**"), and attached thereto the documents evidencing Dantherm's prepetition claims.

22. In response to certain objections to the DIP Motion, on August 17, 2020, Debtors filed their *Omnibus Reply to objections to Debtors' Motion for Approval of Postpetition Financing, Use of Cash Collateral, and Related Relief* [Docket No. 462]. Therein, the Debtors explained, *inter alia,* (a) the DIP Facility consists of two facilities not to exceed $677.5 million, the DIP ABL Fascility shall not exceed $412.5 million, the DIP Term Loan Fscility shall not exceed $265 million, and that the DIP Lenders included some but not all of the prepetition lendrs and the Debtors' designated Stalking Horse Bidder [¶ 8]; (b) the DIP Term Loan Facility will be used to pay in full the Prepetition ABL Obligations upon entry of a final order granting the DIP Facility Motion [¶ 16]; and "the Prepetition ABL Lenders are oversecured, Repaying an oversecured

5

creditor that stands to receive payment in full with postpetition loans will not harm the Debtors' estates and othr creditors – under such circumstances" [¶ 43].

23. On August 20, this Court entered its final order granting the DIP Facility Motion [Docket No. 526]. As set forth in the DIP Facility Motion, the DIP Loans were comprised of two facilities: a revolving credit facility of up to $412.5 million, and a term loan facility of $265 million. The DIP Lenders under the revolving credit facility were to be some of the Prepetition Secured Creditors. The sole lender under the term loan facility was to be the Stalking Horse Bidder.

24. In paragraph 8 of the order, this Court accepted the Debtors' stipulation that as of the Petition Date, the Prepetition ABL Obligations were approximately $326 million, and the value of the Prepetition ABL Collateral was greater than the Prepetition ABL Obligations.

25. Other provisions of the order include:

- In paragraph 9, payment of the Prepetition ABL Obligations by the DIP Term Loans funded by the Stalking Horse Bidder will enable the Debtors to pay administrative expenses;

- In paragraph 16, the Prepetition Secured Parties agreed not to object to the DIP Facilities;

- In paragraph 21, the DIP Liens granted to secure the DIP Obligations would become effective and perfected on the date of the order; and

- In paragraph 21, the DIP Liens were subject to to the rights and interests permitted by § 546 of the Bankruptcy Code.

26. On August 20, 2020, this Court entered its final order on the Critical Vendor Motion. Addressing the Critical Vendor Motion Objection, in paragraph 16 the Court ordered "not later than August 25, 2020, the Debtors shall use reasonable efforts to (a) reconcile the current amount of Dantherm S.p.A.'s ("**Dantherm**") prepetition claim and (b) determine whether Dantherm is a Critical Vendor, Foreign Vendor, and/or 503(b)(9) Claimant, and in each case, notify Dantherm of their determination."

27. The Debtors complied with the order and opted not to designate Dantherm as a Critical Vendor, presumably due to the fact Allmand had already received shortly before the Petition Date the bulk of its forecasted needs for diesel portable air-heaters for the next 12 months, obviating the need to order additional units in advance of the conclusion of the expedited auction sale process.

28. In further compliance with the order, with respect to the amount of Dantherm's prepetition claim, the parties agreed that Dantherm's prepetition claim was $3,008,153.61.

29. The Debtors also agreed that the amount of Dantherm's 503(b)(9) claim was $1,323,611.23.

30. Dantherm's 503(b)(9) claim was thereafter paid in full.

31. On September 15, 2020, this Court entered its order approving the Sale Transaction [Docket No. 898]. As set forth in paragraph 37.e on page 34 of the order, certain objections to the sale were resolved by a Global Settlement reached among several parties, including the Debtor, the PBGC, the Creditors' Committee, the Purchaser, and the DIP Lenders. A key component of the settlement was the PBGC's agreement to limit its claim to $225 million, that the claim would be treated as a general unsecured claim, and that the PBGC would waive and subordinate the first $5 million it would be entitled to receive under the Plan to the claims of general unsecured creditors of the various estates.

32. On November 10, 2020, this Court entered its order approving the Debtors' amended disclosure statement [Docket No. 1233]. Exhibit C to the disclosure statement sets forth the Debtors' Recovery Analysis based on the treatment of claims pursuant to the Plan. The analysis estimates that the unsecured creditors of Allmand would not receive any distribution on account

of their claims absent their entitlement to a *pro rata* distribution of the $5 million subordination provided by the PBGC pursuant to the Global Settlement.

33. The Plan was confirmed on December 18, 2020 [Docket No. 1485].

34. Dantherm filed a proof of claim on October 7, 2020, which was amended on October 14, 2020.

35. After payment of the 503(b)(9) claim and receipt of payment from a non-debtor third party which the parties, including the Debtors, agreed should be applied to the oldest past due prepetition invoices, Dantherm filed the Amended POC on January 18, 2021, asserting a total prepetition claim of $959,577.39, of which the asserted Reclamation Claim equals $517,754.98.

36. For the purpose of the Objection, the Plan Administrator does not dispute the total amount of Dantherm's prepetition claim, but requests that the asserted amount of the Reclamation Claim be reclassified as a general unsecured claim.

## Argument

37. Section 546(c) of the Bankruptcy Code was amended in 2005 by the Bankruptcy Abuse Prevent and Consumer Protection Act ("**BAPCPA**"). Due to the material changes in the statute, pre- and post-BAPCPA decisions often are readily distinguishable. In addition, decisions addressing reclamation rights typically are very fact intensive. Consequently, rationale and rulings in one case may have little if any relevance in a different factual context.

38. In *Reichhold Holdings US, Inc.,* 556 B.R. 107 (Bankr. D. Del. 2016), an interim order was entered two days after the petition date approving a DIP credit facility and authorizing the payment of the prepetition lender's secured claim in full. *Id.* at 109. The liens granted to the DIP lender on the debtor's prepetition and postpetition property, including inventory, were subject to rights permitted under § 546 of the Bankruptcy Code. *Id.* The following day, a seller of goods

8

to the debtor made a demand for reclamation under applicable law. *Id.* Thereafter, the reclaiming seller's reclamation claim was reduced by payments in satisfaction of its 503(b)(9) claim. *Id.*

39. The reclaiming seller's rights were disputed. The objector contended that the prepetition loan and the DIP loan should be treated as an "integrated transaction" and therefore the DIP liens "relate back" to the date of perfection of the prepetition liens. *Id.* at 110. Relying on *Circuit City Stores, Inc.,* 441 B.R. 496 (Bankr. E.D. Va. 2001), the objector also argued that since the prepetition secured creditor had a floating lien on the debtor's inventory and the DIP loan was secured by a floating lien on inventory, the goods securing the prepetition lien were effectively used to repay the debt, thereby extinguishing the asserted reclamation rights. *Id.* The claimant contended that the DIP liens were separate and distinct from the prepetition liens and arose after its reclamation rights arose. *Id.*

40. The *Reichhold* court overruled the objection. Citing *In re Phar-Mor,* 301 B.R. 482, 498 (Bankr. N.D. Ohio 2003), *aff'd* 534 F.3d 502, 506-07 (6th Cir. 2008), the court ruled a debtor's decision to grant a security interest in inventory to a subsequent secured lender cannot defeat an intervening seller's reclamation rights. *Id.* at 111. The court also reject the objector's "integrated transaction" theory and the cases cited in support thereof because the circumstances presented involved two different loans by two different lenders at two different times. *Id.* at 112.

41. The facts and procedural history in *Reichhold* are similar to the circumstances presented here. The Prepetition ABL Obligations were paid by the DIP Term Loan, not the sale of the Dantherm's goods. Dantherm's reclamation rights arose prior to the Petition Date, and thus prior to the approval of the DIP Loans. The DIP Liens are subject to rights permitted under § 546. The Prepetition ABL Obligations and the DIP Loans are two different loans by two different lenders at two different times.

42. Furthermore, the *Reichhold* court's rationale and rulings are even more compelling when applied to the Reclamation Claim because of several distinctions. First, Dantherm served its reclamation demand on the Debtors prior to the final approval of the DIP Loans, not one day after. Second, notice of Dantherm's reclamation rights were filed of record in these cases prior to the final approval of the DIP Loans, and therefore were known by the DIP Lenders prior to the grant and perfection of the DIP Liens, unlike the facts in *Reichhold*. Third, in *Reichhold,* the prepetition secured claim was authorized to be paid in full before the debtor and the DIP lender knew of the reclaiming seller's rights, not after.

43. In *Phar-Mor*, the court ruled that a debtor's decision to grant a security interest in inventory to a subsequent lender cannot defeat a seller's reclamation rights if the seller asserted its rights before the security interest is granted. 301 B.R. at 497. In addition, the court reasoned that a DIP lender having notice of asserted reclamation rights cannot qualify as a "good faith purchaser" under §2-702(C) of the Uniform Commercial Code. *Id.*

44. In *In the Matter of: Specialty Retail Shops Holding Corp.,* 606 B.R. 361, 368 (Bankr. D. Neb. 2019), the court recognized the rationale of *Reichhold* but did not grant relief to the reclaiming seller because the pre-existing secured claim was under-secured.

45. Dantherm respectfully submits the foregoing authorities, all post-BAPCPA decisions, require the Objection to be overruled.

46. Furthermore, Dantherm respectfully submits the Plan Administrator's reliance on the authorities cited in the Objection is misplaced. *In re Pester Refining Co.,* 964 F.2d 842 (8th Cir. 1991) and *In re Bridge Info. Sys., Inc.,* 288 B.R. 133 (Bankr. E.D. Mo. 2001), cited in paragraph 13, are both pre-BAPCPA decisions which discussed tracing of proceeds from the sale of reclamation goods used to pay senior secured debt. These cases are inapplicable here because the

Prepetition ABL Obligations were not paid from proceeds from the sale of Dantherm's goods and therefore tracing is not an issue. In addition, the claims of the pre-existing secured creditor in *Bridge* were under-secured, unlike here. Also, the *Pester* court recognized that when a senior secured claim is paid from sources other than the reclaiming seller's goods, the seller's reclamation rights are preserved. 964 F.2d at 848.

47. *Galey & Lord, Inc. v. Arley Corp. (In re Arlcon, Inc.),* 239 B.R. 261 (Bankr. S.D.N.Y. 1999), also cited in paragraph 13 and a pre-BAPCPA decision, involved the sale of inventory in the ordinary course of business resulting in a deficiency claim held by the lender. Thus, it is not applicable here.

48. *In re Buyer's Club Mkts., Inc.,* 100 B.R. 37 (Bankr. D.Colo. 1989), cited in paragraph 13 and a pre-BAPCPA decision, supports a court's discretion in fashioning equitable relief to a reclaiming seller. In that case, the goods had been sold. Therefore, the reclaiming seller could not reclaim the goods, nor could the court grant a lien on the goods. Nonetheless, the seller was granted an administrative expense claim.

49. Finally, *In re Dairy Mart Convenience Stores, Inc.,* 302 B.R. 128 (Bankr. S.D.N.Y. 2003), cited in paragraph 14 and another pre-BAPCPA decision applied the "integrated transaction" theory which was rejected in *Reichhold* and *Phar-Mor*. The Objection cites *In re Circuit City Stores, Inc.,* 441 B.R. 496 (Bankr. E.D. Va. 2010) in paragraph 16 for the proposition that a reclaiming seller's rights are limited to the goods themselves and do not extend to the proceeds thereof, but that rationale is contrary to all of the other cases cited in the Objection.

50. In the footnote on page 7 of the Objection, the Plan Administrator contends allowing the Reclamation Claim would be unduly prejudicial to unsecured creditors who are estimated to receive 1% to 3% on account of their claims. However, as set forth above, the Global

11

Settlement and the Recovery Analysis illustrate that the entire estimated distribution to unsecured creditors in the Allmand case will come from the PBGC's subordination of the first $5 million it is to receive under the Plan, which is not affected at all by the allowance of the Reclamation Claim.

## Conclusion

51. Dantherm acted diligently in asserting its rights and given all parties in interest, including the DIP Lenders, prompt notice thereof. The authorities cited above support overruling the Objection.

WHEREFORE, Dantherm S.p.A. respectfully requests that the Objection be overruled; and that Dantherm be granted such further and additional relief as may be equitable and just under the circumstances presented.

Dated: January 12, 2022

Respectfully submitted,

DANTHERM S.P.A.

By: */s/ Robert W. Stephens*
Robert W. Stephens (MO #57505)
Swanson Martin & Bell, LLP
800 Market Street, Suite 2100
St. Louis, MO 63101
T: 314-241-7100
F: 314-242-0990
rstephens@smbtrials.com

and

Charles S. Stahl, Jr.
Swanson, Martin & Bell, LLP
2525 Cabot Drive, Suite 204
Lisle, IL 60532
T; 630-799-6990
F: 630-799-6901
cstahl@smbtrials.com

## **CERTIFICATE OF SERVICE**

The undersigned, an attorney, hereby certifies that on this 12th day of January, 2022, a true and correct copy of the above and foregoing RESPONSE TO PLAN ADMINISTRATOR'S OBJECTION TO CREDITOR DANTHERM S.p.A.'s RECLAMATION CLAIM IN AMENDED CLAIM NO. 53-3 was filed electronically with the United States Bankruptcy Court for the Eastern District of Missouri and has been served on the parties in interest via e-mail using the Court's CM/ECF System as listed on the Court's Electronic Mail Notice List.

/s/ Robert W. Stephens